Christopher C. McNatt, Jr. (SBN 174559)
cmcnatt@scopelitis.com
Timothy M. Fisher (SBN 272392)
tfisher@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, LLP
2 North Lake Avenue, Suite 560
Pasadena, California 91101
Tel:  (626) 795-4700
Fax: (626) 795-4790

James H. Hanson (*Pro Hac Vice*)
jhanson@scopelitis.com
James A. Eckhart (SBN 321101)
jeckhart@scopelitis.com
Karen B. Reisinger (*Pro Hac Vice*)
kreisinger@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN  46204
Tel: (317) 637-1777
Fax: (317) 687-2414

Attorneys for Defendants,
J.B. HUNT TRANSPORT SERVICES, INC. and
J.B. HUNT TRANSPORT, INC.

UNITED STATE DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIRIK ISSAIAN, individually and on behalf of himself, all others similarly situated, and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>J.B. HUNT TRANSPORT SERVICES, INC., an Arkansas corporation, J.B. HUNT TRANSPORT, INC., a Georgia corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: 2:20-cv-00732-SVW-MAA<br><br><br>**DEFENDANTS' FIRST AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT; DEFENDANT J.B. HUNT TRANSPORT, INC.'S COUNTERCLAIM** |

## ANSWER

Defendants, J.B. Hunt Transport Services, Inc., and J.B. Hunt Transport, Inc., pursuant to Fed. R. Civ. P. 8(b) and for their answer to Plaintiff's First Amended Complaint, state as follows:

## I.    INTRODUCTION

1.    The California Labor Code provides legal rights to employees and requires employers to meet various legal obligations to their employees, such as the duty to reimburse their employees for all expenses necessarily incurred in connection with their employment (Lab. Code §2802), the duty to provide meal and rest breaks (Lab. Code §510, 226.7), and other legal obligations. Under settled law, employers may not avoid these legal obligations by misclassifying their employees as "independent contractors" if the employers treat workers as employees.

**RESPONSE:**    Defendants admit the California Labor Code provides certain rights to certain employees and imposes certain obligations on certain employers, including rights and obligations related to expense reimbursement under Cal. Lab. Code § 2802 and meal and rest breaks under Cal. Lab. Code §§ 226.7 and 512. Defendants deny the remaining allegations contained in paragraph 1 of the First Amended Complaint.

2.    Defendant J. B. HUNT TRANSPORT SERVICES, INC., is the holding company and the parent corporation of Defendant J. B. HUNT TRANSPORT, INC., (collectively referred to as "JB HUNT" and/or "Defendants"). JB HUNT is a Fortune 500 company and one of the largest transportation logistics companies in North America, providing transportation services to customers throughout the continental United States, Canada and Mexico.[1] JB HUNT touts its "ability to offer multiple

---

[1] *https://www.jbhunt.com/company/*

services, utilizing our four business segments and a full complement of logistics services through third parties, represents a competitive advantage. We believe this unique operating strategy can add value to customers and increase our profits and returns to stockholders."[2] To do so, in addition to the thousands of employee drivers that JB HUNT employs within its Intermodal,[3] Dedicated Contract Services,[4] and Truckload business units, it also employs many "Owner Operator" drivers within the same business units as its employee drivers yet classifies the drivers as independent contractors. The independent contractor truck drivers were denied the rights and protections guaranteed by California law to all employees, including the right to be reimbursed for business-related expenses and the right to receive duty-free meal periods and rest periods. JB HUNT's mischaracterization of their drivers as independent contractors, and the attendant deprivation of substantial rights and benefits of employment are part of an on-going unfair, and/or unlawful and/or fraudulent business practice that this court should enjoin.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 2 of the First Amended Complaint.

---

[2] *https://www.jbhunt.com/company/*

[3] "Our Intermodal division offers more traditional driving duties - drivers transport freight containers from rail yards to customer locations. As the industry leader in intermodal, J.B. Hunt drivers reap the rewards of a growing intermodal market and our longstanding relationships with major rail providers. We have over 84,000 containers and company-owned and maintained chassis, as well as private speed gates at a number of facilities for efficient service. Intermodal driving jobs operate 24/7 leaving drivers with freedom and power to choose a schedule that works for them. The consistency in freight and familiar routes allow drivers to get the most out of their workday." *https://drivers.jbhunt.com/jobs/local-truck-driving-jobs*

[4] "Our Dedicated Contract Services (DCS) accounts each serve a single customer, allowing drivers access to familiar routes, customers and work duties. We operate more than 9,600 trucks in nearly 600 account locations, making J.B. Hunt the largest dedicated provider in the United States. J.B. Hunt's Dedicated division offers drivers a unique experience because they can do more than just drive. Depending on the account, dedicated drivers perform duties like operating forklifts and pallet jacks to complete deliveries. Additionally, driving dedicated offers a variety of equipment including flatbed, reefer, doubles and traditional van trailers." *https://drivers.jbhunt.com/jobs/local-truck-driving-jobs*

3.     This lawsuit seeks relief for Plaintiff as an "owner operator" driver that JB HUNT misclassified as independent contractor.

**RESPONSE:**     Defendants deny the allegations contained in paragraph 3 of the First Amended Complaint.

4.     The acts complained of herein have occurred, are presently occurring, and are expected to continue occurring, within the time period from four (4) years preceding the filing of the Complaint herein.

**RESPONSE:**     Defendants deny the allegations contained in paragraph 4 of the First Amended Complaint.

5.     This lawsuit also seeks damages for disability discrimination, failure to provide reasonable accommodations, failure to engage in good faith interactive process, retaliation and wrongful termination.

**RESPONSE:**     Defendants deny the allegations contained in paragraph 5 of the First Amended Complaint.

## II.    PARTIES

6.     At all times relevant for purposes of this Complaint, Plaintiff, GIRIK ISSAIAN ("Plaintiff") has been a resident of Los Angeles County in the State of California. During the relevant Period, Plaintiff worked for JB HUNT in California at its center of operations located at 5650 Southern Ave., South Gate, California 90280.

**RESPONSE:**     Upon information and belief, Defendants admit that Plaintiff is a resident of Los Angeles County, California. Defendants admit Plaintiff sometimes operated from the terminal at 5650 Southern Ave., South Gate, California 90280, but deny the remaining allegations contained in paragraph 6 of the First Amended Complaint.

7.      Plaintiff is informed believes and thereon alleges that Defendant J. B. HUNT TRANSPORT SERVICES, INC., is an Arkansas corporation authorized to do business and doing business in the State of California at various locations throughout the state including at least one location in Los Angeles County at 5650 Southern Ave., South Gate, California 90280.

**RESPONSE:**      Defendants admit J. B. Hunt Transport Services, Inc. is an Arkansas corporation but deny the remaining allegations contained in paragraph 7 of the First Amended Complaint.

8.      Plaintiff is informed believes and thereon alleges that Defendant J. B. HUNT TRANSPORT, INC., is a Georgia corporation authorized to do business and doing business in the State of California at various locations throughout the state including at least one location in Los Angeles County at 5650 Southern Ave., South Gate, California 90280.

**RESPONSE:**      Defendants admit the allegations contained in paragraph 8 of the First Amended Complaint.

9.      Plaintiff is ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants named herein as DOES 1 through 50, inclusive, and therefore sues Defendants by such fictitious names. Defendants DOES 1 through 50, at all times relevant for purposes of this Complaint were employees, agents, officers and/or members of the board of directors of Defendants. Plaintiff will amend this complaint to allege the true names and capacities of the Defendants designated herein as DOES 1 through 50, inclusive, when they have been ascertained.

**RESPONSE:**      Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 9 of the First Amended Complaint and therefore deny the allegations contained in paragraph 9 of the First Amended Complaint.

10.    Plaintiff is informed, believes, and thereon alleges that Defendants designated herein as DOES 1 through 50, inclusive, are responsible in some manner for the acts, events and occurrences alleged herein, and caused or contributed to the damages sustained by Plaintiff.

**RESPONSE:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 10 of the First Amended Complaint and therefore deny the allegations contained in paragraph 10 of the First Amended Complaint.

11.    Plaintiff is informed, believes, and thereon alleges that at all times relevant for purposes of this Complaint, the Defendants designated herein as DOES 1 through 50, inclusive, acted as the agents, employees, directors, officers, co-venturers, and partners of the named Defendants and such fictitiously-named Defendants. Each of them, while acting in the course and scope of their agency, employment, corporate capacities, and partnership, performed the acts and conduct hereinafter alleged, and said acts and conduct were ratified and approved by each Defendant.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 11 of the First Amended Complaint.

### III.    SUMMARY OF FACTUAL ALLEGATIONS

12.    JB HUNT holds itself out as one of the largest transportation logistics companies in North America providing transportation services to customers throughout the continental United States, Canada and Mexico. Within its Intermodal, Dedicated Contract Services, and Truckload business units, the same business units that its employee truck drivers operated within, JB HUNT hired "Owner Operator" truck drivers and classified them as independent contractors.

**RESPONSE:**    Defendants admit they form one of the largest surface transportation, delivery, and logistics companies in North America and that they

provide transportation and delivery services to customers throughout the continental United States, Canada, and Mexico. Defendants deny the remaining allegations contained in paragraph 12 of the First Amended Complaint.

13.    During the relevant period, JB HUNT employed Plaintiff as an "Owner Operator" truck driver that it classified as independent contractors.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 13 of the First Amended Complaint.

14.    As a condition of employment, the JB HUNT required Plaintiff to sign a lengthy form contract entitled the "Independent Contractor Operating Agreement" that mischaracterizes Plaintiff as an independent contractor.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 14 of the First Amended Complaint.

15.    In the Agreement, Plaintiff was defined as "Contractor" and JB HUNT was defined as "Carrier." The Agreement provided, among other things, that:

   a.    Contractors were required to lease to Carrier the tractor trucks owned by Contractors;

   b.    Carrier was granted exclusive possession and control of the tractor trucks for the duration of the lease and Contractors were prohibited from entering into any agreement for use of the leased tractor truck for the benefit of any other person without Carrier's express written authority;

   c.    Carrier assumed complete responsibility for the operation of the leased tractor trucks for the duration of the lease;

   d.    Carrier was fully responsible for the safe operation of the leased tractor truck and the Contractors' compliance with all federal motor

carrier safety regulations;

    e.    Carrier provided primary insurance for the protection of the public. However, Contractors were required to maintain non-trucking "Bobtail" insurance, at their own expense, in the amount of $1,000,000.00 per occurrence and were required to name Carrier as an additional insured; and

    f.    Contractors were required to maintain workers compensation insurance at their own expense and were required to name Carrier as an additional insured on Contractors' policy.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 15 of the First Amended Complaint.

16.    The purported "Independent Contractor Operating Agreement" concealed the true nature of the relationship between JB HUNT and Plaintiff. In reality, the relationship was that of employer and employee because JB HUNT controlled virtually all of material aspects of the employment relationship, including disciplining drivers.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 16 of the First Amended Complaint.

17.    JB HUNT retained the right to control the manner and means by which Plaintiff performed his job. For example, JB HUNT prohibited Plaintiff from driving for other transportation companies as JB HUNT considered it to be a "conflict of interest;" JB HUNT required Plaintiff to work a normal recurring schedule; and JB HUNT required Plaintiff to accept the delivery loads as assigned. In addition, Plaintiff performed duties that are a regular part of J.B. Hunt's transportation business.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 17 of the First Amended Complaint.

18.     Despite exercising such dominion and control over Plaintiff, JB HUNT failed to provide Plaintiff with legally compliant meal periods or rest periods even though he regularly worked ten or more hours per day while under the direction and control of JB HUNT.

**RESPONSE:**     Defendants deny the allegations contained in paragraph 18 of the First Amended Complaint.

19.     In addition, JB HUNT made deductions from Plaintiff's earnings for customary business-related expenditures, including but not limited to, expenses for truck repair and maintenance, Bobtail insurance, On Board Computer "OBC" Usage,[5] Occupational Accidental Insurance, Physical Damage Insurance, Fuel Purchase, Fuel and Use Tax, Short Term Aid, and an STA Admin Fee.

**RESPONSE:**     Defendants deny the allegations contained in paragraph 19 of the First Amended Complaint.

20.     JB HUNT also failed to provide Plaintiff with accurate itemized wage statements, and failed to pay Plaintiff all wages due at the time of separation.

**RESPONSE:**     Defendants deny the allegations contained in paragraph 20 of the First Amended Complaint.

21.     JB HUNT also discriminated against Plaintiff based on his actual or perceived disability, failed to provide reasonable accommodations, failed to engage in good faith interactive process, retaliated and terminated Plaintiff's employment in violation of public policy.

**RESPONSE:**     Defendants deny the allegations contained in paragraph 21 of the First Amended Complaint.

---

[5] Each tractor truck was configured with communications equipment, i.e., a scanner, which used JB HUNT's customized and/or proprietary tracking software.

22.    On or about November 2, 2018, Plaintiff was dispatched to pick up an empty container from the train station in Los Angeles. Upon exiting the lot, Plaintiff's truck was struck by another truck that tried to pass, pushing Plaintiff's truck in the trailer in front of him.

**RESPONSE:**    Defendants admit that, on November 2, 2018, Plaintiff agreed to transport an empty trailer from the BNSF railyard in Los Angeles, California; that Plaintiff reported to J.B. Hunt Transport, Inc., and that, while he was in line to exit the gate, the end of a trailer in the lane to his right caught Plaintiff's tires and pulled him into the trailer in front of him. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 22 of the First Amended Complaint and therefore deny them.

23.    As a result of the work related accident, Plaintiff sustained injuries to his right knee and back and stomach area.

**RESPONSE:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 23 of the First Amended Complaint and therefore deny the allegations contained in paragraph 23 of the First Amended Complaint.

24.    Plaintiff immediately contacted his supervisor Samantha Ibarra and reported the incident and informed her that he was experiencing significant pain.

**RESPONSE:**    Defendants admit that Plaintiff contacted Samantha Ibarra on November 2, 2018 and reported he had been in an accident and that he was in pain. Defendants deny that Samantha Ibarra was Plaintiff's supervisor. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 24 of the First Amended Complaint and therefore deny them.

25.     Ms. Ibarra instructed Plaintiff to obtain the information for the other driver and to stay at the scene of the accident.

**RESPONSE:**     Defendants deny the allegations contained in paragraph 25 of the First Amended Complaint.

26.     Eventually the paramedics were called and Plaintiff was transported to the emergency room for evaluation.

**RESPONSE:**     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 26 of the First Amended Complaint and therefore deny the allegations contained in paragraph 26 of the First Amended Complaint.

27.     Upon his discharge, Plaintiff immediately contacted Ms. Ibarra who at that time instructed Plaintiff to report to US Healthworks to have a drug test performed. Plaintiff reported to US Heathwork and performed the required drug test and obtained the paperwork for Defendants, which he provided to Defendant on the same day.

**RESPONSE:**     Defendants admit that Plaintiff was advised to report for a drug test. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in paragraph 27 of the First Amended Complaint and therefore deny them.

28.     Thereafter, Plaintiff started treating with a physician for his injuries and was placed off work. Plaintiff provided the medical documentation to defendants and requested accommodations in the form of a finite leave of absence.

**RESPONSE:**     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 28 of the First Amended Complaint and therefore deny the allegations contained in paragraph 28 of the First Amended Complaint.

29.    As a result of Plaintiff's inability to return to work since November 2, 2018, due to his actual or perceived disability, Plaintiff's employment was terminated on February 6, 2019.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 29 of the First Amended Complaint.

30.    At all applicable times mentioned in this complaint, Defendant regularly employed five or more persons bringing Defendants within the provisions of the FEHA.

**RESPONSE:**    Defendants admit the allegations contained in paragraph 30 of the First Amended Complaint.

31.    Plaintiff has adequately exhausted all of his administrative remedies under FEHA and obtained a "right to sue" letter from the Department of Fair Employment and Housing against Defendants.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 31 of the First Amended Complaint.

## FIRST CAUSE OF ACTION
### FAILURE TO INDEMNIFY EXPENSES
### (Lab. Code § 2802)
### (Against All Defendants and DOES 1-50, inclusive)

32.    Plaintiff hereby alleges and incorporates by reference, as though fully set forth herein, the allegations contained paragraphs 1 through 31.

**RESPONSE:**    For their response to paragraph 32 of the First Amended Complaint, Defendants incorporate by reference their responses to paragraphs 1 through 31 of the First Amended Complaint as if fully set forth herein.

33.    While acting on the direct instruction of Defendants and discharging their

duties for Defendants, Plaintiff incurred work-related expenses including but not limited to, expenses for truck repair and maintenance, expenses for Bobtail insurance, workers compensation insurance, occupational accident insurance, fuel purchase, fuel and use tax, and fees for the OBC usage. Plaintiff necessarily incurred these substantial expenses as a direct result of performing his job duties for Defendants.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 33 of the First Amended Complaint.

34.    Defendants failed to indemnify or in any manner reimburse Plaintiff for these expenditures, and have knowingly inserted illegal contractual provisions as part of an unconscionable and illegal scheme designed to avoid its legal duty to indemnify its employees, including Plaintiff. By misclassifying its Plaintiff as "independent contractors," and further by contractually requiring Plaintiff to pay his own expenses, Defendants have violated and continues to violate Cal. Labor Code § 2802.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 34 of the First Amended Complaint.

35.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered substantial losses according to proof, including prejudgment interest, costs and attorney fees for the prosecution of this action.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 35 of the First Amended Complaint.

## <u>SECOND CAUSE OF ACTION</u>
### RECOVERY OF DEDUCTIONS FROM WAGES
### (Lab. Code § 221 AND 224)

(Against all Defendants and DOES 1-50, inclusive)

36.    Plaintiff hereby alleges and incorporates by reference, as though fully set

forth herein, the allegations contained paragraphs 1 through 35.

**RESPONSE:**    For their response to paragraph 36 of the First Amended Complaint, Defendants incorporate by reference their responses to paragraphs 1 through 35 of the First Amended Complaint as if fully set forth herein.

37.    Defendants have unlawfully withheld monies from the compensation earned by Plaintiff for business expenses of Defendants, including but not limited to, Bobtail insurance, On Board Computer "OBC" Usage, Occupational Accidental Insurance, Physical Damage Insurance, Fuel Purchase, Fuel and Use Tax, Short Term Aid, and an STA Admin Fee in violation of California Labor Code §§ 221.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 37 of the First Amended Complaint.

38.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered substantial losses and been deprived of compensation to which he was entitled, including monetary damage, pre-judgment interest, costs and reasonable attorney fees.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 38 of the First Amended Complaint.

39.    As a direct and proximate result of Defendants' conduct, Plaintiff who was terminated without being paid his full compensation, by virtue of such illegal deductions, is also entitled to thirty additional days of pay pursuant to California Labor Code §§ 201-203.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 39 of the First Amended Complaint.

40.    As a direct and proximate result of Defendants' conduct as alleged, Plaintiff has suffered substantial monetary losses, according to proof at the time of trial,

plus pre-judgement interest, costs, and reasonable attorney fees.

**RESPONSE:**        Defendants deny the allegations contained in paragraph 40 of the First Amended Complaint.


### THIRD CAUSE OF ACTION

### FAILURE TO PROVIDE MEAL PERIODS

### (Lab. Code § 512, 226.7, and IWC Order 9-2004)

### (Against all Defendants and DOES 1-50, inclusive)

41.    Plaintiff hereby alleges and incorporates by reference, as though fully set forth herein, the allegations contained paragraphs 1 through 40.

**RESPONSE:**        For their response to paragraph 41 of the First Amended Complaint, Defendants incorporate by reference their responses to paragraphs 1 through 40 of the First Amended Complaint as if fully set forth herein.


42.    Defendants required Plaintiff to work more than five hours without providing him with a thirty-minute duty-free meal period as required by California Labor Codes §§ 510, 226.7 and California Industrial Welfare Commission Wage Order 9, which is applicable to Plaintiff.

**RESPONSE:**        Defendants deny the allegations contained in paragraph 42 of the First Amended Complaint.


43.    In addition, Defendants required Plaintiff to work more than ten hours without providing a second thirty-minute duty-free meal period as required by California Labor Codes §§ 510, 226.7 and California Industrial Welfare Commission Wage Order 9, which is applicable to Plaintiff.

**RESPONSE:**        Defendants deny the allegations contained in paragraph 43 of the First Amended Complaint.

44.     Per Labor Code §226.7(c) [sic], an employer who fails to provide meal periods must pay the employee one additional hour of pay at the employee's regular rate for each day that a meal period was not provided. Consequently, Plaintiff is entitled to recover pay at the regular rate of pay for each workday that such meal periods were not provided.

**RESPONSE:**     Defendants deny the allegations contained in paragraph 44 of the First Amended Complaint.

45.     Defendants have failed to pay premium payments in lieu of providing the meal periods in violation of the aforesaid provisions of the Labor Code and IWC Wage Order 9.

**RESPONSE:**     Defendants deny the allegations contained in paragraph 45 of the First Amended Complaint.

46.     As a direct and proximate result of Defendants' conduct as alleged, Plaintiff has suffered substantial monetary losses, according to proof at the time of trial, plus pre-judgement interest, costs, and reasonable attorney fees.

**RESPONSE:**     Defendants deny the allegations contained in paragraph 46 of the First Amended Complaint.

## FOURTH CAUSE OF ACTION

### FAILURE TO PROVIDE REST PERIODS

**(Lab. Code § 512, 226.7, and IWC Order 9-2004)**

**(Against all Defendants and DOES 1-50, inclusive)**

47.     Plaintiff hereby alleges and incorporates by reference, as though fully set forth herein, the allegations contained paragraphs 1 through 46.

**RESPONSE:**     For their response to paragraph 47 of the First Amended Complaint, Defendants incorporate by reference their responses to paragraphs 1 through

46 of the First Amended Complaint as if fully set forth herein.

48.    Defendants required Plaintiff to work without providing him with a paid duty-free ten-minute rest period per every fours or major fraction thereof that Plaintiff worked. Defendants also failed to pay premium payments in lieu of providing duty-free rest periods.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 48 of the First Amended Complaint.

49.    Per Section 12 of the Industrial Welfare Commission Wage Order No. 9-2004 [sic], an employer who fails to provide rest periods must pay the employee one additional hour of pay at the employee's regular rate for each day that a rest period was not provided.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 49 of the First Amended Complaint.

50.    By virtue of being deprived of such meal periods, Plaintiff is entitled to recover premium pay at the regular rate of pay for each workday that such rest period was not provided. Defendants have failed and refused to pay such additional compensation in violation of the aforesaid provisions of the Labor Code and IWC Wage Order 9.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 50 of the First Amended Complaint.

51.    As a direct and proximate result of Defendants' conduct as alleged, Plaintiff has suffered substantial monetary losses, according to proof at the time of trial, plus pre-judgement interest, costs, and reasonable attorney fees.

**RESPONSE:**      Defendants deny the allegations contained in paragraph 51 of the First Amended Complaint.

<strong><u>FIFTH CAUSE OF ACTION</u></strong>

<strong>FAILURE TO PROVIDE ACCURATE ITEMIZED STATEMENT</strong>

<strong>(Lab. Code § 226(a))</strong>

<strong>(Against all Defendants and DOES 1-50, inclusive)</strong>

52.    Plaintiff hereby alleges and incorporates by reference, as though fully set forth herein, the allegations contained paragraphs 1 through 51.

**RESPONSE:**      For their response to paragraph 52 of the First Amended Complaint, Defendants incorporate by reference their responses to paragraphs 1 through 51 of the First Amended Complaint as if fully set forth herein.

53.    Pursuant to Labor Code §226 (a):

> "Every employer shall, semimonthly or at the time of each payment of wages, furnish each of his or her employees, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately when wages are paid by personal check or cash, an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee, except for any employee whose compensation is solely based on a salary and who is exempt from payment of overtime under subdivision (a) of Section 515 or any applicable order of the Industrial Welfare Commission, (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and his or her social security number, except that by January 1, 2008, only the last four digits of his or her social security number or an employee identification number other than a social security may be shown on the itemized statement, (8) the name and address of the legal entity that is the employer, and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee…"

**RESPONSE:**      Defendants admit that Cal. Lab. Code § 226(a) states: "An employer, semimonthly or at the time of each payment of wages, shall furnish to his or

her employee, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately if wages are paid by personal check or cash, an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee, except as provided in subdivision (j), (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and only the last four digits of his or her social security number or an employee identification number other than a social security number, (8) the name and address of the legal entity that is the employer and, if the employer is a farm labor contractor, as defined in subdivision (b) of Section 1682, the name and address of the legal entity that secured the services of the employer, and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee and, beginning July 1, 2013, if the employer is a temporary services employer as defined in Section 201.3, the rate of pay and the total hours worked for each temporary services assignment. The deductions made from payment of wages shall be recorded in ink or other indelible form, properly dated, showing the month, day, and year, and a copy of the statement and the record of the deductions shall be kept on file by the employer for at least three years at the place of employment or at a central location within the State of California. For purposes of this subdivision, "copy" includes a duplicate of the itemized statement provided to an employee or a computer-generated record that accurately shows all of the information required by this subdivision." Defendants deny them.

54.    At all relevant times, Defendants, and each of them, have violated the rights of Plaintiff under Labor Code 226(a) by knowingly and intentionally failing to provide him with written wage statements to accurately reflect the gross wages earned,

total hours worked as a result of not providing Plaintiff with rest or meal periods, all lawful deductions, and net wages earned.

**RESPONSE:** Defendants deny the allegations contained in paragraph 54 of the First Amended Complaint.

55.    Plaintiff is informed believes and thereon alleges that Defendants did not maintain accurate business records pertaining to the total hours worked by Plaintiff. By failing to keep adequate records as required by sections 226 and 1174(d) of the Labor Code, Defendant has injured Plaintiff and made it difficult to calculate the compensation due to Plaintiff.

**RESPONSE:** Defendants deny the allegations contained in paragraph 55 of the First Amended Complaint.

56.    As a result of the unlawful acts of Defendant, Plaintiff seeks wages in amounts to be determined at trial, plus interest and penalties, attorney's fees and costs pursuant to Labor Code sections 203, 204, 218, 226, 1174(d) and applicable IWC Wage Orders.

**RESPONSE:** Defendants deny the allegations contained in paragraph 56 of the First Amended Complaint.

## SIXTH CAUSE OF ACTION

### FAILURE TO PAY WAGES AT THE TIME OF SEPARATION

### (Lab. Code § 201)

### (Against all Defendants and DOES 1-50, inclusive)

57.    Plaintiff hereby alleges and incorporates by reference, as though fully set forth herein, the allegations contained paragraphs 1 through 56.

**RESPONSE:** For their response to paragraph 57 of the First Amended Complaint, Defendants incorporate by reference their responses to paragraphs 1 through

56 of the First Amended Complaint as if fully set forth herein.

58.    Defendant has not fully compensated Plaintiff for the above-mentioned period. As a result of the actions alleged above, Defendant failed to pay all wages earned by Plaintiff at the time of his termination, in violation of Labor Code section 201. By failing to keep adequate records as required by sections 226 and 1174(d) of the Labor Code, Defendant has injured Plaintiff and made it difficult to calculate the compensation due to Plaintiff.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 58 of the First Amended Complaint.

59.    As a result of the unlawful acts of Defendants, Plaintiff seeks wages in amounts to be determined at trial, plus interest and penalties, attorney's fees and costs pursuant to Labor Code sections 201, 203, 204, 218.5, 218.6, 226, 1174(d) and applicable IWC Wage Orders.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 59 of the First Amended Complaint.

## SEVENTH CAUSE OF ACTION
### WAITING TIME PENALTIES
### (Labor Code § 203)
### (Against all Defendants and DOES 1-50, inclusive)

60.    Plaintiff hereby alleges and incorporates by reference, as though fully set forth herein, the allegations contained paragraphs 1 through 59.

**RESPONSE:**    For their response to paragraph 60 of the First Amended Complaint, Defendants incorporate by reference their responses to paragraphs 1 through 59 of the First Amended Complaint as if fully set forth herein.

61.    During the relevant Period, Plaintiff was employed by and thereafter terminated by Defendants. Defendants, however, willfully failed to pay Plaintiff all wages owed to him and failed to pay Plaintiff within the time limits set forth in California Labor Code sections 201 and 202.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 61 of the First Amended Complaint.

62.    Under Labor Code sections 201, 202, and 203, Plaintiff who no longer work [sic] for Defendants is entitled to waiting time penalties for Defendants' willful failure to timely pay all wages owed upon separation of his employment, including attorney fees and cost of suit.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 62 of the First Amended Complaint.

## **EIGHTH CAUSE OF ACTION**
### **UNFAIR BUSINESS PRACTICES**
### **(Bus. & Prof. Code, § 17200 et seq.)**
### **(Against all Defendants and DOES 1-50, inclusive)**

63.    Plaintiff hereby alleges and incorporates by reference, as though fully set forth herein, the allegations contained paragraphs 1 through 62.

**RESPONSE:**    For their response to paragraph 63 of the First Amended Complaint, Defendants incorporate by reference their responses to paragraphs 1 through 62 of the First Amended Complaint as if fully set forth herein.

64.    The California Unfair Business Practices Act, Cal. Bus. & Prof. Code § 17200 et seq. [sic] prohibits businesses and/or individuals from engaging in business practices which are unlawful, unfair or fraudulent.

**RESPONSE:**    Defendants state that California's Unfair Competition Law,

Cal. Bus. & Prof. Code § 17200 *et seq.*, speaks for itself and therefore deny the allegations contained in paragraph 64 of the First Amended Complaint.

65.     By all of the foregoing alleged conduct of failing to indemnify Plaintiff for work-related expenses, by unlawfully deducting money from wages, by failing and refusing to provide meal periods, by failing and refusing to provide rest periods, and by engaging in the other acts and conduct alleged above, Defendants have committed, and are continuing to commit, ongoing unlawful, unfair and fraudulent business practices within the meaning of Cal. Bus. & Professions Code § 17200 et seq. [sic].

**RESPONSE:**     Defendants deny the allegations contained in paragraph 65 of the First Amended Complaint.

66.     As a direct and proximate result of the unfair business practices described above, Plaintiff has suffered significant losses and Defendant has been unjustly enriched.

**RESPONSE:**     Defendants deny the allegations contained in paragraph 66 of the First Amended Complaint.

67.     Pursuant to Cal. Bus. & Prof. Code §17203, Plaintiff is entitled to: (a) restitution of money acquired by defendant by means of its unfair business practices, in amounts not yet ascertained but to be ascertained at trial; (b) injunctive relief against Defendant's continuation of its unfair business practices, and (c) a declaration that Defendants' business practices is unfair within the meaning of the statute.

**RESPONSE:**     Defendants deny the allegations contained in paragraph 67 of the First Amended Complaint.

//

//

//

## NINTH CAUSE OF ACTION

### INJUNCTIVE RELIEF

### (Cal. B&P Code §17203)

### (Against all Defendants and DOES 1-50, inclusive)

68.    Plaintiff hereby alleges and incorporates by reference, as though fully set forth herein, the allegations contained paragraphs 1 through 67.

**RESPONSE:**    For their response to paragraph 68 of the First Amended Complaint, Defendants incorporate by reference their responses to paragraphs 1 through 67 of the First Amended Complaint as if fully set forth herein.

69.    By failing to indemnify for work-related expenses, by unlawfully deducting money from wages, by failing and refusing to provide meal periods, by failing and refusing to provide rest periods, and by engaging in the other acts and conduct alleged above, Defendants have committed and are continuing to commit, ongoing unlawful, unfair and fraudulent business practices within the meaning of Cal. Bus. & Professions Code § 17200 et seq. [sic]. Defendant, if not enjoined by this Court, will continue to engage in the said unlawful, unfair and fraudulent business practices in derogation of the rights of Plaintiff to be free from such improper and anti-competitive conduct.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 69 of the First Amended Complaint.

70.    Absent injunctive relief enjoining Defendant from engaging in the unlawful, unfair and fraudulent business practices described above, Plaintiff will be irreparably injured, the extent, nature and amount of such injury being impossible to ascertain.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 70 of

the First Amended Complaint.

71.    Plaintiff has no plain, speedy, and adequate remedy at law.

**RESPONSE:**        Defendants deny the allegations contained in paragraph 71 of
the First Amended Complaint.

72.    For these reasons, preliminary and permanent injunctive relief is
appropriate.

**RESPONSE:**        Defendants deny the allegations contained in paragraph 72 of
the First Amended Complaint.

<u>**TENTH CAUSE OF ACTION**</u>

**DISABILITY DISCRIMINATION**

**(Cal. Gov. Code § 12940, et seq. [sic])**

**(Against all Defendants and DOES 1-50, inclusive)**

73.    Plaintiff hereby alleges and incorporates by reference, as though fully set
forth herein, the allegations contained paragraphs 1 through 72.

**RESPONSE:**        For their response to paragraph 73 of the First Amended
Complaint, Defendants incorporate by reference their responses to paragraphs 1 through
72 of the First Amended Complaint as if fully set forth herein.

74.    At all times herein mentioned, California Government Code section 12940
et seq. [sic], the Fair Employment and Housing Act, were in full force and effect and
were binding on Defendant and each of them, as Defendant regularly employed five (5)
or more persons.

**RESPONSE:**        Defendants deny the allegations contained in paragraph 74 of
the First Amended Complaint.

*//*

75.    At all times herein mentioned in this complaint, Government Code section 12940, et seq., and the California Constitution Article 1, section 8 were in full force and effect and was binding on the Defendants and the Defendants were subject to their terms, and therefore Defendants were required to refrain from violations of public policy, including but not limited to discrimination based on an actual or perceived disability, in violation of the California Fair Employment and Housing Act.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 75 of the First Amended Complaint.

76.    At all times herein mentioned, Plaintiff was and is a member of a protected class, in that he suffered from an actual or perceived disability.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 76 of the First Amended Complaint.

77.    Plaintiff was treated less favorably than similarly situated co-workers with respect to the terms, conditions and privileges of his employment, and Defendants' policies and procedures were applied differently to Plaintiff compared to other persons employed by Defendants due to Plaintiff's actual or perceived disability.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 77 of the First Amended Complaint.

78.    Plaintiff's employment was terminated by Defendants due to his actual or perceived disability and in retaliation for his request for reasonable accommodations, in the form of finite leave of absence.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 78 of the First Amended Complaint.

79.    Defendants' discriminatory actions against Plaintiff, as alleged herein,

constituted unlawful discrimination in employment on account of Plaintiff's actual or perceived disability, in violation of California Government Code section 12940, et seq.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 79 of the First Amended Complaint.

80.    As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that he has suffered and will continue to suffer actual, consequential, and incidental financial losses, including without limitation loss of income, salary and benefits, and the intangible loss of employment-related opportunities for growth in his field and damage to his professional reputation, all in an amount according to proof at the time of trial.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 80 of the First Amended Complaint.

81.    As a direct, foreseeable and proximate result of Defendants' wrongful acts, Plaintiff has suffered, and continues to suffer, substantial losses of earnings and employment benefits, and has suffered humiliation, embarrassment, mental and emotional distress and discomfort, all to his damage in an amount proven at trial.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 81 of the First Amended Complaint.

82.    Plaintiff is informed and believes and therein alleges that the aforesaid acts directed toward him were carried out with a conscious disregard of his right to be free from such illegal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code section 3294, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants named herein.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 82 of the First Amended Complaint.

83.    Plaintiff is also entitled to an award of statutory attorneys' fees pursuant to California Government Code section 12965 (b).

**RESPONSE:**    Defendants deny the allegations contained in paragraph 83 of the First Amended Complaint.

## ELEVENTH CAUSE OF ACTION

### FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS

### (Cal. Gov. Code § 12940 et seq. [sic])

### (Against all Defendants and DOES 1-50, inclusive)

84.    Plaintiff hereby alleges and incorporates by reference, as though fully set forth herein, the allegations contained paragraphs 1 through 83.

**RESPONSE:**    For their response to paragraph 84 of the First Amended Complaint, Defendants incorporate by reference their responses to paragraphs 1 through 83 of the First Amended Complaint as if fully set forth herein

85.    While Plaintiff was employed with Defendants, Defendants were aware that Plaintiff suffered from an actual or perceived disability. Plaintiff informed Defendants that he needed reasonable accommodations in the form of a finite leave of absence.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 85 of the First Amended Complaint.

86.    Although Defendants knew of Plaintiff's physical disability, Defendants refused to accommodate Plaintiff's disability upon Plaintiff's request, and instead terminated Plaintiff while he was on a leave of absence because of his disability, in direct contravention of the FEHA, and specifically in violation of California Government Code section 12940.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 86 of

the First Amended Complaint.

87.    Plaintiff alleges that he could have fully performed all duties and functions of his job in an adequate, satisfactory and/or outstanding manner, particularly if he was provided with reasonable accommodations as required.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 87 of the First Amended Complaint.

88.    As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that he has suffered and will continue to suffer actual, consequential, and incidental financial losses, including without limitation loss of income, salary and benefits, and the intangible loss of employment-related opportunities for growth in his field and damage to his professional reputation, all in an amount according to proof at the time of trial.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 88 of the First Amended Complaint.

89.    As a direct, foreseeable and proximate result of Defendants' wrongful acts, Plaintiff has suffered, and continues to suffer, substantial losses of earnings and employment benefits, and has suffered humiliation, embarrassment, mental and emotional distress and discomfort, all to his damage in an amount proven at trial.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 89 of the First Amended Complaint.

90.    Plaintiff is informed and believes and therein alleges that the aforesaid acts directed toward him were carried out with a conscious disregard of his right to be free from such illegal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code section 3294, entitling Plaintiff to punitive damages in an

amount appropriate to punish and set an example of Defendants named herein.

**RESPONSE:**       Defendants deny the allegations contained in paragraph 90 of the First Amended Complaint.

91.    Plaintiff is also entitled to an award of statutory attorneys' fees pursuant to California Government Code section 12965 (b).

**RESPONSE:**       Defendants deny the allegations contained in paragraph 91 of the First Amended Complaint.

## TWELFTH CAUSE OF ACTION

### FAILURE TO ENGAGE IN GOOD FAITH INTERACTIVE PROCESS

**(Cal. Gov. Code § 12940 et seq. [sic])**

**(Against all Defendants and DOES 1-50, inclusive)**

92.    Plaintiff hereby alleges and incorporates by reference, as though fully set forth herein, the allegations contained paragraphs 1 through 91.

**RESPONSE:**       For their response to paragraph 92 of the First Amended Complaint, Defendants incorporate by reference their responses to paragraphs 1 through 91 of the First Amended Complaint as if fully set forth herein.

93.    At all times herein mentioned, California Government Code section 12940 et seq. was in full force and effect and was binding on Defendants and each of them, as Defendants regularly employed five (5) or more persons. According to California Government Code section 12940, subdivision (n), it is an unlawful employment practice for an employer or other covered entity to fail to engage in a timely, good faith, interactive process with the employee or applicant with a known disability to determine effective reasonable accommodations.

**RESPONSE:**       Defendants admit that, under Cal. Gov. Code § 12940(n), "[i]t is an unlawful employment practice, unless based upon a bona fide occupational

qualification, or, except where based upon applicable security regulations established by the United States or the State of California . . . [f]or an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." Defendants deny the remaining allegations contained in paragraph 93 of the First Amended Complaint.

94.    While Plaintiff was employed with Defendants, Defendants were aware that Plaintiff was disabled and required accommodations. In fact, Plaintiff requested reasonable accommodations in the form of a finite leave of absence.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 94 of the First Amended Complaint.

95.    Plaintiff is informed and believes, and thereon alleges that at no time did Defendants engage in any sort of interactive process, as required by California Government Code section 12940, subdivision (n), to accommodate Plaintiff's known disability, and instead terminated his employment effective February 6, 2019.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 95 of the First Amended Complaint.

96.    As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that he has suffered and will continue to suffer actual, consequential, and incidental financial losses, including without limitation loss of income, salary and benefits, and the intangible loss of employment-related opportunities for growth in his field and damage to his professional reputation, all in an amount according to proof at the time of trial.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 96 of

the First Amended Complaint.

97.    As a direct, foreseeable and proximate result of Defendants' wrongful acts, Plaintiff has suffered, and continues to suffer, substantial losses of earnings and employment benefits, and has suffered humiliation, embarrassment, mental and emotional distress and discomfort, all to his damage in an amount proven at trial.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 97 of the First Amended Complaint.

98.    Plaintiff is informed and believes and therein alleges that the aforesaid acts directed toward him were carried out with a conscious disregard of his right to be free from such illegal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code section 3294, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants named herein.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 98 of the First Amended Complaint.

99.    Plaintiff is also entitled to an award of statutory attorneys' fees pursuant to California Government Code section 12965 (b).

**RESPONSE:**    Defendants deny the allegations contained in paragraph 99 of the First Amended Complaint.

## THIRTEENTH CAUSE OF ACTION
## RETALIATION
### (Cal. Gov. Code § 12940 et seq. [sic])
### (Against all Defendants and DOES 1-50, inclusive)

100.    Plaintiff hereby alleges and incorporates by reference, as though fully set forth herein, the allegations contained paragraphs 1 through 99.

**RESPONSE:**      For their response to paragraph 100 of the First Amended Complaint, Defendants incorporate by reference their responses to paragraphs 1 through 99 of the First Amended Complaint as if fully set forth herein.

101.   Plaintiff engaged in protected conduct protected by the FEHA. Plaintiff informed Defendants that he was disabled and needed reasonable accommodations in connection therewith.

**RESPONSE:**      Defendants deny the allegations contained in paragraph 101 of the First Amended Complaint.

102.  Thereafter, rather than providing Plaintiff with reasonable accommodations, Defendants retaliated against Plaintiff. The acts of retaliation include, but are not limited to, terminating Plaintiff's employment on February 6, 2019.

**RESPONSE:**      Defendants deny the allegations contained in paragraph 102 of the First Amended Complaint.

103.   The foregoing conduct constitutes acts of retaliation performed by Defendants in response to Plaintiff's conduct in (a) asserting the existence of his disability, and (b) requesting reasonable accommodations in connection with the same.

**RESPONSE:**      Defendants deny the allegations contained in paragraph 103 of the First Amended Complaint.

104.   Plaintiff is informed and believes, and based thereon alleges, that in addition to the practices enumerated above, Defendants have engaged in other retaliatory actions against Plaintiff which are not yet fully known. At such time, as said discriminatory practices become known to him, Plaintiff will seek leave of this Court to amend this Complaint.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 104 of the First Amended Complaint.

105.    As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that he has suffered and will continue to suffer actual, consequential, and incidental financial losses, including without limitation loss of income, salary and benefits, and the intangible loss of employment-related opportunities for growth in his field and damage to his professional reputation, all in an amount according to proof at the time of trial.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 105 of the First Amended Complaint.

106.    As a direct, foreseeable and proximate result of Defendants' wrongful acts, Plaintiff has suffered, and continues to suffer, substantial losses of earnings and employment benefits, and has suffered humiliation, embarrassment, mental and emotional distress and discomfort, all to his damage in an amount proven at trial.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 106 of the First Amended Complaint.

107.    Plaintiff is informed and believes and therein alleges that the aforesaid acts directed toward him were carried out with a conscious disregard of his right to be free from such illegal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code section 3294, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants named herein.

**RESPONSE:**    Defendants deny the allegations contained in paragraph 107 of the First Amended Complaint.

108.    Plaintiff is also entitled to an award of statutory attorneys' fees pursuant to

California Government Code section 12965 (b).

**RESPONSE:**        Defendants deny the allegations contained in paragraph 108 of the First Amended Complaint.

## FOURTEENTH CAUSE OF ACTION

### WRONGFUL TERMINATION

### (Violation of Public Policy)

### (Against all Defendants and DOES 1-50, inclusive)

109.   Plaintiff hereby alleges and incorporates by reference, as though fully set forth herein, the allegations contained paragraphs 1 through 108.

**RESPONSE:**        For their response to paragraph 109 of the First Amended Complaint, Defendants incorporate by reference their responses to paragraphs 1 through 108 of the First Amended Complaint as if fully set forth herein.

110.   At all times herein mentioned in this complaint, California Government Code section 12940, et seq., and California Constitution Article 1, Section 8, were in full force and effect and were binding on the Defendants and the Defendants were subject to their terms, and therefore Defendants was required to refrain from violations of public policy, including discrimination on the account of Plaintiff's actual or perceived disability.

**RESPONSE:**        Defendants deny the allegations contained in paragraph 110 of the First Amended Complaint.

111.   As a direct result of the discriminatory, harassing and retaliatory acts by Defendants, Plaintiff was terminated, in direct violation of public policy. Defendants knew or reasonably should have known of the intolerable discriminatory acts and conditions and of their impact on and other employees similarly situated and could have remedied the situation.

**RESPONSE:**        Defendants deny the allegations contained in paragraph 111 of the First Amended Complaint.

112.    As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has been harmed in that he has suffered and will continue to suffer actual, consequential, and incidental financial losses, including without limitation loss of income, salary and benefits, and the intangible loss of employment-related opportunities for growth in his field and damage to his professional reputation, all in an amount according to proof at the time of trial.

**RESPONSE:**        Defendants deny the allegations contained in paragraph 112 of the First Amended Complaint.

113.    As a direct, foreseeable and proximate result of Defendants' wrongful acts, Plaintiff has suffered, and continues to suffer, substantial losses of earnings and employment benefits, and has suffered humiliation, embarrassment, mental and emotional distress and discomfort, all to his damage in an amount proven at trial.

**RESPONSE:**        Defendants deny the allegations contained in paragraph 113 of the First Amended Complaint.

114.    Plaintiff is informed and believes and therein alleges that the aforesaid acts directed toward him were carried out with a conscious disregard of his right to be free from such illegal behavior, such as to constitute oppression, fraud, or malice pursuant to California Civil Code section 3294, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of Defendants named herein.

**RESPONSE:**        Defendants deny the allegations contained in paragraph 114 of the First Amended Complaint.

//

//

# AFFIRMATIVE DEFENSES

Defendants, pursuant to Fed. R. Civ. P. 8(c) and for their affirmative defenses to Plaintiff's First Amended Complaint, plead the following separate and additional defenses to the First Amended Complaint, without in any way agreeing or conceding that they have the burden of proof or persuasion on any of these issues or that they are liable for any claims asserted against them:

1.      The First Amended Complaint should be dismissed because Plaintiff has failed to allege facts sufficient to support a claim for relief under the statutes identified in the First Amended Complaint.

2.      Some or all of Plaintiff's claims are barred or reduced, in whole or in part, (a) by the doctrines of waiver, estoppel and laches; (b) Plaintiff has been paid in full or under the doctrine of accord and/or satisfaction; (c) by the doctrine of set off and recoupment; (d) by the applicable statute of limitations; (e) because Plaintiff lacks standing to bring those claims; (f) by Plaintiff's failure to mitigate his damages; and/or (g) by the doctrine of avoidable consequences.

3.      Plaintiff's claims must be dismissed to the extent they relate to work activities performed outside California because California law does not apply to work activities performed outside the state.

4.      The business practices alleged in the First Amended Complaint are not "unfair," "unlawful," or "fraudulent" as those terms are defined and utilized in California Business & Professions Code §§ 17200 *et seq*. (the UCL).

5.      Plaintiff's claims are barred, in whole or in part, because the alleged practices are not unfair, the public is not likely to be deceived by any alleged practices, and Defendants gained no competitive advantage by such practices, and the benefits of the alleged practices outweigh any harm or other impact they may cause.

6.      The UCL is unconstitutional, vague, and over broad in the manner in which Plaintiff claims that the statute applies to Defendants' business practices; the UCL thus violates Defendants' rights to due process and equal protection.

7.    Defendants did not employ Plaintiff, either directly or jointly. Plaintiff was an independent contractor under California law and is therefore not entitled to any of the relief requested.

8.    Plaintiff's claim for waiting time penalties under California Labor Code §§ 201-203 is barred because (a) a good faith, bona fide dispute exists or existed as to whether additional compensation is or was owed under §§ 201 and 202; (b) Defendants have not intentionally or willfully failed to pay compensation to Plaintiff; (c) the imposition of penalties in this action would be inequitable and unjust; and (d) Plaintiff or other persons he seeks to represent who claim such penalties did not resign or was or were not discharged prior to the filing of this action or was or were under contract at the time the First Amended Complaint was filed.

9.    Plaintiff's claims for penalties under California Labor Code § 226 are barred because (a) Defendants did not employ Plaintiff; (b) a good faith, bona fide dispute exists regarding whether Defendants provided Plaintiff with inaccurate, itemized wage statements under California Labor Code § 226; (c) Defendants have not knowingly or intentionally failed to provide Plaintiff with accurate, itemized wage statements; and (d) the imposition of penalties would be inequitable and unjust. Moreover, Plaintiff has failed to show any injury resulting from any alleged violation of California Labor Code § 226.

10.    The imposition of penalties, including replicating penalties, as applied to the alleged facts and circumstances of this case, would violate Defendants' due process rights under the Fourteenth Amendment to the U.S. Constitution and under the Constitution of the State of California. *Lockyer v. R.J. Reynolds Tobacco Co.*, 37 Cal. 4th 707 (2005); *Ratner v. Chem. Bank N.Y. Trust Co.*, 54 F.R.D. 412 (S.D.N.Y. 1972).

11.    Any actions taken by Defendants toward Plaintiff were lawful and not in violation of public policy.

12.    To the extent Plaintiff seeks to recover equitable relief whether under the UCL or otherwise, Plaintiff is not entitled to that relief because (a) he has an adequate

remedy at law and (b) he lacks standing because he is not currently under contract with Defendants.

13.    Even assuming for the sake of argument that Defendants violated a statute under California law, any alleged violation was a result of an act or omission in good faith, and Defendants had reasonable grounds for believing the act or omission was not a violation of any statute, order, regulation, or policy.

14.    Pre-judgment interest may not be granted because the damages claimed by Plaintiff are not sufficiently certain to allow an award of pre-judgment interest.

15.    Plaintiff's claims for illegal deductions are barred because (a) there is no private right of action under California Labor Code § 221; and (b  the deductions were permitted under California Labor Code § 224 and the Federal Leasing Regulations, 49 C.F.R. Part 376.

16.    Plaintiff's claims regarding Defendants' alleged failure to provide meal and rest breaks under California law are preempted under the Supremacy Clause of the U.S. Constitution, U.S. CONST. art. VI, cl. 2, because (a) California's meal and rest break rules conflict with the federal hours of service regulations, 49 C.F.R. Part 395, by imposing a different standard than that carefully set at the federal level by the Federal Motor Carrier Safety Administration (FMCSA), an agency of the U.S. Department of Transportation (DOT); and (b) the FMCSA's regulation of the hours of service of drivers in interstate commerce through the federal hours of service regulations, 49 C.F.R. Part 395, leaves no room for additional or supplemental state regulation of drivers' hours of service.

17.    The FMCSA precludes the application and prohibits the enforcement of California's meal and rest break laws to commercial drivers pursuant to 49 U.S.C. § 31141. *See California's Meal and Rest Break Rules for Commercial Motor Vehicle Drivers*; Petition for Determination of Preemption, 83 Fed. Reg. 67, 470 (Dec. 28, 2018).

18.    Plaintiff cannot recover alleged unpaid meal break compensation under the

UCL because any payment under California Labor Code § 226.7 is not subject to equitable relief.

19.     Some or all of Plaintiff's claims are preempted under the Supremacy Clause of the U.S. Constitution, U.S. CONST., art. VI, cl. 2, because they are related to Defendants' prices, routes, and services within the meaning of the express preemption provision of the Federal Aviation Administration Authorization Act (FAAAA), 49 U.S.C. § 14501.

20.     To the extent Plaintiff purports to apply the "ABC test" announced in *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903, 915 (2018), or legislated in Cal. Labor Code § 2750.3, the FAAAA preempts the application of the "ABC test" and requires Plaintiff's claims of alleged employment misclassification to be decided under the factors laid out in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989).

21.     Plaintiff's claim for failure to adequately indemnify him for employment-related losses/expenditures in violation of California Labor Code § 2802 is barred because the losses Plaintiff alleges were not incurred by him as an employee or in direct consequence of the discharge of his duties.

22.     Plaintiff's claims regarding Defendants' alleged failure to reimburse Plaintiff's business expenses and for unlawful deductions under California law are preempted under the Supremacy Clause of the U.S. Constitution, U.S. CONST., art. VI, cl. 2, because they conflict with the Federal Leasing Regulations, 49 C.F.R. Part 376, by prohibiting what is expressly permitted under those regulations.

23.     To the extent Plaintiff seeks to recover under California's meal and rest break rules for a driver hauling hazardous materials, that recovery is preempted under the Supremacy Clause of the U.S. Constitution, U.S. CONST., art. VI, cl. 2, because the California meal and rest break rules are in direct conflict with the requirements of 49 C.F.R. § 172.800 and because the Pipeline and Hazardous Materials Safety Administration has preempted the meal and rest break rules as applied to hazardous

material loads. *See Hazardous Materials: California Meal and Rest Break Requirements*, 83 Fed. Reg. 47961 (Sept. 21, 2018).

24.    Plaintiff's claims are barred because they are an undue burden upon interstate commerce in violation of the Commerce Clause of the U.S. Constitution, U.S. CONST., art. I, § 8, cl. 3.

25.    Plaintiff's claims regarding Defendants' alleged failure to pay all wages owed every pay period are barred because California Labor Code § 204 does not provide a private right of action.

26.    To the extent that Plaintiff seeks punitive damages based on the alleged acts of Defendants, the First Amended Complaint violates Defendants' right to substantive due process as provided by the U.S. Constitution and the Constitution of the State of California.

27.    Plaintiff's claims that Defendants failed to reimburse him for work-related expenses and losses should be dismissed because Plaintiff failed to sufficiently identify alleged work-related expenses, failed to claim that he requested reimbursement for any alleged expenses, and failed to allege it was reasonable and necessary for Plaintiff to incur those expenses.

28.    Plaintiff's claims against unnamed "DOE" defendants must be dismissed because Plaintiff has failed to allege facts sufficient to state a claim upon which relief may be granted with respect to those purported defendants and because Plaintiff has failed to identify and serve those purported defendants in a timely manner.

29.    Plaintiff's damages, if any, are proximately caused by his voluntary decision to enter into a business relationship with J. B. Hunt Transport, Inc., as an independent contractor under contract with J. B. Hunt Transport, Inc., and thus are not damages but rather are costs arising from that business relationship.

30.    To the extent Plaintiff demonstrates that he was misclassified as an independent contractor, he may only avail himself of the remedies afforded for rescission and restitution and alleged violations of the California Labor Code.

31.     Plaintiff's claims, or portions thereof, are barred to the extent that they are the subject of any release entered into by or on behalf of Plaintiff.

32.     Plaintiff's claims are barred by Plaintiff's failure to exhaust administrative remedies.

33.     The Court lacks jurisdiction over any claims of discrimination, retaliation, failure to accommodate, or denial of other rights that are not like or reasonably related to the allegations in Plaintiff's complaint purportedly filed with the California Department of Fair Employment and Housing.

34.     All actions of which Plaintiff complains were taken for legitimate, non-discriminatory reasons.

35.     Defendants were fully justified and exercised reasonable care, prudence, skill and business judgment in their relationship with Plaintiff. Any decisions with respect to Plaintiff were made without consideration of improper or illegal matters. Defendants acted in good faith, consistent with the law and with established policies and practices.

36.     Some or all of Plaintiff's claims are barred because accommodation of Plaintiff's disability, if any, would have imposed any or all of the following: (a) an undue hardship on Defendants; (b) a direct threat to the health and safety of Plaintiff; (c) a direct threat to the health and safety of others; and (d) a restructuring of the position that would require others to perform essential functions of Plaintiff's job.

37.     Plaintiff's claims are barred in whole or in part because, even if Defendants engaged in the conduct alleged, Defendants would have taken any and all such actions against Plaintiff for legitimate, independent reasons regardless of Plaintiff's alleged protected status.

38.     To the extent Plaintiff's claims are based in whole or in part upon alleged misconduct by agents or employees of Defendants other than Defendants themselves, Plaintiff's claims are barred because such conduct was beyond the course and scope of those agents' or employees' respective agency or employment with Defendants.

39.     Each Defendant denies that it acted as the employee, agent, servant, partner, alter ego and/or joint venture of one or more of the other Defendants named in Plaintiff's First Amended Complaint at the time the causes of action arose.

40.     Defendants will rely on all defenses lawfully available to them at the time of trial and reserve the right to amend their answer and affirmative defenses to include additional defenses after the completion of discovery.

WHEREFORE, Defendants respectfully request the following relief:

a.     Plaintiff be denied all relief and take nothing by way of the First Amended Complaint;

b.     Judgment be entered against Plaintiff and in favor of Defendants;

c.     Defendants be awarded attorneys' fees and costs in defending this case; and

d.     Defendants be awarded all other necessary and proper relief.

## COUNTERCLAIM

Counterclaim Plaintiff J.B. Hunt Transport, Inc., under Fed. R. Civ. P. 13 and for its Counterclaim against Counterclaim Defendant, Girik Issaian ("Issaian"), states as follows:

## PARTIES

1.     Counterclaim Plaintiff, a Georgia corporation with its principal place of business in Arkansas, is a transportation and logistics company that, in part, provides regulated, for-hire transportation services in interstate commerce.

2.     Upon information and belief, Issaian is, and at all times relevant to this Counterclaim was, an adult residing in California.

## JURISDICTION

3.     This Court has supplemental jurisdiction over this Counterclaim under 28 U.S.C. § 1367(a) because the claims asserted in the Counterclaim are so related to the

claims asserted in the Complaint that they form a part of the same case and controversy under Article III of the U.S. Constitution.

## FIRST CAUSE OF ACTION

### Rescission and Restitution

4.     Issaian owns a 2009 Freightliner tractor (VIN 1FUJGLCK39LAE8674), which he agreed to lease to Counterclaim Plaintiff with a qualified driver, pursuant to the Federal Leasing Regulations, 49 C.F.R. Part 376. Copies of his leases with appendices are attached collectively as *Exhibit A*.

5.     Pursuant to his leases, Issaian agreed to bear the operational expenses associated with the use and operation of his tractor and any qualified drivers he provided to perform transportation services for Counterclaim Plaintiff's customers, including fuel, oil, tires, and maintenance and repair costs.

6.     In exchange for Issaian's agreement to bear these expenses, Counterclaim Plaintiff agreed to compensate him, as specified in Appendix B to his leases, for the use of the equipment and the services provided under the leases for the deliveries they completed.

7.     Nowhere in Issaian's leases, including schedules, appendices or amendments, did Issaian and Counterclaim Plaintiff agree that Counterclaim Plaintiff would pay any specific amount for the labor of the qualified drivers Issaian provided in connection with providing the transportation services.

8.     Issaian cannot use the claims he asserts in the Complaint, including the assertion that Counterclaim Plaintiff misclassified him as an independent contractor, to re-write the terms of his leases with Counterclaim Plaintiff. *See Series AGI W. Linn of Appian Grp. Inv'rs DE LLC v. Eves*, 158 Cal. Rptr. 3d 193, 200 (Cal. Ct. App. 2013) ("Neither abstract justice nor the rule of liberal interpretation justifies the creation of a contract for the parties which they did not make themselves.") (citations and quotations omitted).

9. Rather, to the extent Issaian demonstrates that he was misclassified as an independent contractor, he may only avail himself of the remedies afforded for rescission and restitution and alleged violations of the California Labor Code.

10. California Labor Code § 1197 and IWC Wage Order No. 9-2001, Section 4, provide that employees must be paid at least the minimum wage for each hour worked.

11. California Labor Code § 2802 provides that employers must indemnify their employees for all reasonable expenditures incurred in direct consequence of the discharge of their duties.

12. To the extent Issaian demonstrates he was misclassified, his recovery for wages and expenses is limited to the deficit, if any, between the amount Counterclaim Plaintiff has already compensated him pursuant to the terms of his lease less the wages he was entitled to for personally performing work (as measured by the hours worked times the minimum wage) and the reasonable expenses he incurred in carrying out that work.

WHEREFORE, Counterclaim Plaintiff demands judgment against Issaian as follows:

A. For rescission of the leases and restitution of all amounts paid to Issaian set off by only the reasonable amounts he paid for the operation of his truck in providing the transportation services for Counterclaim Plaintiff's customers and the minimum wage for hours he actually worked;

B. For an award of pre-judgment and post-judgment interest;

C. For attorney fees and costs of this action; and

D. For all other necessary and proper relief.

//
//
//
//

# **DEMAND FOR JURY TRIAL**

Defendant/Counterclaim Plaintiff, under Fed. R. Civ. P. 38(b) and Local Rules 38-1 & 38-2, demands a trial by jury of this action.


Dated: October 30, 2020

SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.

By:   /s/ *James H. Hanson*

James H. Hanson

Attorney for Defendants,
J.B. Hunt Transport Services, Inc. and
J.B. Hunt Transport, Inc.

4824-8008-3399, v. 8

46

# Exhibit A

# Copies of Plaintiff's Leases with Appendices

P 1/25

### J.B. Hunt Transport, Inc.
### Intermodal Independent Contractor Operating Agreement

This agreement is made this _06_ day of _04_ , 20 _11_

between _Girik Issaian_ as "Contractor" and J.B. HUNT

TRANSPORT, INC., as "Carrier," and shall begin on the date and time appearing on Appendix

A. This agreement shall end at midnight exactly one year from the start date appearing on

Appendix A. In consideration of the mutual promises made in this agreement, Contractor and

Carrier agree as follows:

#### PREAMBLE

J.B. HUNT TRANSPORT, INC. is a motor carrier authorized to transport freight in

interstate and intrastate commerce. Contractor is the owner of motor vehicle equipment which

Contractor desires to lease to Carrier with qualified driver(s). The parties acknowledge this Lease

must follow certain regulations of the United States Department of Transportation ("USDOT")

including, but not limited to, safety and leasing regulations. Contractor agrees to provide the

motor vehicle identified below and a driver for that motor vehicle. The driver and the motor

vehicle will be in compliance with all USDOT requirements. Carrier will pay Contractor in

accordance with the terms of this Lease Agreement.

#### AGREEMENT

1.      **Identity of Parties:**

Contractor is:

Full Name: _Girik Issaian_

Address: _███████████████████████_

Phone Number: _(714) 822- 8800_

SSN or FEIN No. if a corporation: _████████████_

JBHI000261



P 2/25

GJ

Carrier (also referred to as "JBHT") is:

**J.B. HUNT TRANSPORT, INC.**
615 J. B. Hunt Corporate Drive, PO Box 425
Lowell, Arkansas 72745
Phone: 479-820-0000

2. **Identification of Equipment to be Leased:** Contractor leases to Carrier the motor vehicle or vehicles described as follows:

**Tractor**

Year: _2004_

Make/Model: _FRHT Colombia_

State Registration: _CA_

Vehicle Identification Number: _1FUJA6CK84LM60893_

3.   **Receipt of Equipment:** The equipment which Contractor will lease to Carrier pursuant to the terms and conditions of this Agreement is identified in the attached Appendix A, which, when executed, will show the date and time of the receipt of the equipment by Carrier. Upon termination of this lease, or when possession by Carrier of the equipment identified in Appendix A ends, Contractor shall give Carrier or its authorized representative a receipt evidencing the date and time of the return of the equipment to Contractor's control.

4.   **Exclusive Use:** Contractor agrees neither it nor its drivers shall have authority to enter into any agreement for the use of the leased equipment covered by this Agreement for the benefit of any person other than Carrier without prior written consent of Carrier.

5.   **Payment to Contractor:** Reference the Intermodal Addendum to the Independent Contractor Operating Agreement Attachment B.

6.   **Time and Conditions of Payment:** Payment to the Contractor shall be made within fifteen (15) days after submission of the necessary delivery documents, logbooks required by the USDOT, and those documents necessary for Carrier to secure payment from the shipper,

JBHI000262

which are the bill of lading, signed delivery receipt or other proof of delivery acceptable to Carrier. Payment of compensation to Contractor shall not be contingent upon submission of a bill of lading to which no exceptions have been taken. In the case of a C.O.D. shipment only, Contractor must deliver the certified check or money order due the Carrier and any other documents necessary for Carrier to secure payment from the shipper. Carrier shall provide Contractor with notice at the time of dispatch that the particular shipment is a C.O.D. delivery, specifying which documents are required to be delivered to Carrier.

7.  <u>Term and Termination:</u>    The term of this Agreement will commence upon execution and delivery of the receipt of equipment to Carrier, as reflected by Appendix A, and shall end at midnight one year later. It shall be renewed and extended automatically from year to year thereafter unless cancelled or terminated under the provisions of this Lease Agreement. Either party may terminate this Agreement upon 30 days written notice. Carrier may terminate this Agreement upon written notice or by on-board written transmission in the event of serious breach by Contractor. A serious breach shall be defined as (1) evidence of a felony committed while in operation of the leased equipment; (2) evidence of a chargeable personal injury accident; (3) violations of U.S. DOT safety regulations which imperil Carrier's safety rating; (4) unauthorized use of leased equipment; and (5) any breach of service obligations which imperil carrier's license, permits, insurance, or customer relations.

8.  <u>Exclusive Possession and Responsibilities:</u>    Carrier shall have exclusive possession, control and use of the equipment for the duration of the Lease. Carrier shall assume complete responsibility for the operation of the equipment for the duration of the Lease. Contractor specifically agrees it will not use the authorities, placards or vehicle identification numbers of Carrier to perform services for any other person, firm or company without having the express written consent of Carrier.

P 4/25     GI

9. **Status as Independent Contractor:**   At all times during the period this lease is in effect, Contractor shall be an independent contractor with respect to the transportation operations conducted on behalf of the Carrier.  Neither Contractor nor its employees are to be considered employees of Carrier at any time, except as may be specified by federal or state law.  Neither party is the agent of the other nor shall have the right to bind the other by contract or otherwise except as herein specifically provided.

10. **Driver Qualification:**   Contractor warrants that each driver of the Equipment shall be qualified to drive under USDOT regulations which require among other things the driver to have a validly issued Commercial Driver's License, health card and any other documentation required by the USDOT.  Contractor agrees that the person will not operate the Equipment during the term of this lease without first being qualified by Carrier. Contractor acknowledges its driver must pass all of the USDOT tests, including drug and alcohol tests and agrees to submit to and bear the costs of such testing. Contractor further agrees to be solely responsible for compensating its driver, including but not limited to, wages, withholding taxes, FICA, worker's compensation, overtime and any and all other costs associated with employing its driver.

11. **Carrier's Duty:**   During the term of this Agreement, Carrier agrees to make freight available to Contractor for transportation by Contractor; provided, however, Contractor understands and agrees that in no event shall Carrier guarantee to Contractor any specific number of miles or loads, any specific amount of freight or any specific times, dates or routes.

12. **Warranties of Contractor:**   Contractor agrees and warrants as follows:

    a.     Contractor is the owner of the equipment described in this lease, within the meaning of 49 C.F.R. §376.2(d).

    b.     Equipment Warranties. The above-described equipment is in good condition and fully complies with all safety regulations and requirements of the

P 5/25     GL

USDOT and that Contractor will maintain such equipment in good condition and compliance during the term of this lease. Costs of all expenses to maintain that equipment in good and lawful condition in compliance with USDOT standards shall be borne by Contractor. The U.S. Department of Transportation Federal Motor Carrier Safety Regulations found at 49 C.F.R. 396 et seq. or any successor regulations specify that all motor vehicles subject to an independent contractor operating agreement be subjected to systematic inspections and repairs. Contractor hereby agrees that, pursuant to said regulations and at such times as Carrier may reasonably require, Contractor shall cause the Equipment to be inspected at such facilities as Carrier shall have approved (such approval not to be unreasonably withheld) and to effect needed repairs at Contractor's sole cost and expense. Contractor shall submit to Carrier records of inspections, repairs and maintenance as required by Federal Safety Regulations.

c.    Expenses. Contractor shall bear the operational expenses incurred in performing the transportation services requested by Carrier under this lease agreement. Those expenses are limited to: all fuel, oil, tires and equipment, accessories, or devices used in connection with the operation of the equipment; maintenance costs including repairs; taxes and assessments, fuel and fuel use taxes; fines and penalties resulting solely from the acts or omissions of Contractor and its employees; insurance costs relating to insurance coverage required to comply with this agreement; federal highway use tax on the equipment; federal, provincial, state or city income taxes, and any self-employment or payroll taxes; and any sales, use, excise and other taxes due and owing to ownership or operation of the equipment. Contractor shall also bear any expenses necessary to maintain the equipment in compliance with all applicable federal and state safety laws and regulations. Contractor shall be responsible for all costs associated with

JBHI000265

P 6/25    G2

detention, loading and unloading. Carrier will compensate Contractor for such services in accordance with the schedule set forth in Appendix B. Upon termination of this lease if there are any costs associated with unused portions of any of the above referenced operational expenses, those costs shall be borne by Contractor unless otherwise specified in this lease.

d.    Services and Compliance. Contractor agrees to transport the freight tendered to it by Carrier from point of origin to point of destination in a reasonable and timely manner. If Contractor does not or cannot complete the load, Contractor will be responsible for the costs of repowering the load – unless Carrier's acts or omissions have caused Contractor's inability to complete the load. Contractor and its drivers shall comply with all laws, rules and regulations of the USDOT and other federal, state and local governmental agencies. Nothing contained herein shall require the Contractor to violate the safe transportation of the equipment or the hours-of-service rules of the USDOT, and Contractor may refuse to transport the freight tendered to it by Carrier if Contractor believes that the transportation would result in such violation.

e.    Use of Carrier Equipment. Contractor will be responsible for Carrier's actual costs in recovering any "non-owned" trailer for which Contractor has accepted dispatch and which he/she has also wrongfully abandoned. For the purposes of this Agreement, a "non-owned" trailer is a trailer that either Carrier or Carrier's customer has provided to Contractor for providing his/her transportation services for Carrier. In the event Contractor uses the trailers for any other purpose, Carrier shall, in addition to any other remedies, be entitled to liquidated damages for the loss of use of each such trailer in the amount of twenty cents ($0.20) per mile of unauthorized use plus fifty dollars ($50.00) for each day, or portion of a day, of such unauthorized use. Unauthorized use of the trailers shall

JBHI000266

P 7/25   G I

constitute a material breach of this Agreement. Carrier shall have the right to deduct the amount of such liquidated damages from the Contractor's settlements or escrow funds.

f.     Service Standards. Contractor shall perform freight transportation services in compliance with all applicable laws and regulations and further shall make every reasonable effort to perform freight transportation services hereunder in a prompt, competent and diligent manner consistent with Carrier's standards of customer service and satisfaction. Contractor shall immediately report to Carrier any disagreements, altercations or other circumstances or disputes involving shippers or their agents, employee or consignees that would tend, in any way, to detract from the quality and reliability of Carrier's service or to damage Carrier's reputation.

g.     Acceptance of Loads. Contractor shall have the right to reject any shipment tendered to it by Carrier. When Contractor accepts a shipment tendered to it for transportation, Contractor agrees to perform its services hereunder in such a manner as to satisfy the requirements of Carrier's customers including, but not limited to, complying with pick-up and/or delivery dates and times specified by Carrier's customers and by complying with the Carrier's operating policies and procedures. The failure of the Contractor to fulfill this obligation will constitute a material breach of this Agreement. Contractor agrees that it is liable and will reimburse Carrier for the entire amount of any claims paid by Carrier as the result of late delivery of shipments accepted by Contractor where such late delivery is the Contractor's fault. Carrier shall have the right to deduct the amount of such claims from Contractor's settlements or escrow account.

JBHI000267

P 8/25    GI

h.    Taxes.

(1)    Income Taxes. Contractor shall pay all taxes and fees (including penalties and interest) imposed by any Federal, Provincial, State or local government on account of the receipt of income by Contractor for freight transportation services rendered under this Agreement. Contractor understands and agrees that Carrier shall not be required to withhold any income or other taxes imposed on income earned by Contractor hereunder and Contractor agrees to take any action necessary to ensure that Carrier is not subject to such a requirement. Contractor shall file all Federal, Provincial, State or local government tax forms and returns as required in connection with the receipt of income by Contractor and shall pay when due all taxes and contributions reported in such forms and returns. Contractor shall furnish Carrier with such evidence of compliance with the foregoing as Carrier shall reasonably request.

(2)    Operating Taxes. Contractor shall pay all Federal Heavy Vehicle Use taxes, fuel taxes, road taxes, mileage taxes, property taxes and all other taxes and fees (including penalties and interest) imposed by any Federal, Provincial, State or local government related to the use and operation of the equipment leased by Contractor to Carrier hereunder. Carrier will set aside funds from the Contractor's weekly settlement for this purpose and will reconcile actual Contractor liabilities on a quarterly basis. Carrier will file all Federal and State government tax forms and returns as required in connection with the use and operation of the equipment hereunder.

(3)    Employment Taxes. Contractor shall pay or withhold all employment-related taxes and fees and other related taxes and fees (including penalties and interest) imposed by any Federal, Provincial, State or local government by virtue of Contractor's status as an employer or sole proprietor, as

JBHI000268

P 9/25

GT

the case may be. Contractor shall file all Federal, Provincial, State or local government tax forms and returns as required in connection with its status as an employer or sole proprietor and shall pay or withhold when due all taxes and contributions reported in such forms and returns. Contractor shall furnish Carrier with such evidence of compliance with the foregoing as Carrier shall reasonably request.

(4)    Toll Operating Costs. Carrier shall provide Contractor an E-Z Pass to be permanently attached to the tractor for toll transactions in all E-Z Pass participating states for the duration of this Agreement. Carrier shall also provide toll charge cards to Contractor for other states as needed. Carrier will deduct $28 from Contractor as a deposit for the E-Z Pass and $5 for each additional toll card issued. These deposits will be returned to Contractor following the termination of the lease, provided the E-Z Pass and toll card(s) are returned to Carrier. Carrier will charge Contractor for any toll violations incurred by Contractor.

13. Insurance:  Carrier will provide primary insurance for the protection of the public pursuant to USDOT regulations presently found under 49 U.S.C. 13906. Non-Trucking "Bobtail" insurance must be provided by Contractor in the amount of $1,000,000 per occurrence and Carrier will be provided with a suitable certificate of insurance naming Carrier as additional insured.  If Contractor desires to purchase insurance through Carrier's insurance agent, Contractor will so signify by signing Appendix C of this Agreement and will authorize a deduction from compensation in the amount shown thereon. Carrier will provide Contractor with a copy of any policy for which a deduction is agreed to upon request.

14. Worker's Compensation/Occupational Accident Insurance:

a.    Insurance.  During the term of this Agreement, Contractor shall, at Contractor's expense, carry and maintain in full force and effect either worker's compensation

JBHI000269

P 10/25          GT

and other employer's liability insurance as required by applicable law covering all persons employed by Contractor, or a substitute policy acceptable to Carrier if Contractor is a sole proprietor, such as occupational accident insurance providing similar coverage and benefits, in connection with the performance of freight transportation services hereunder as will fully protect Contractor from any and all claims under applicable law.

b.    Certificate of Insurance.  All such insurance policies required under Paragraph 14(a) above shall be non-cancellable and non-amendable without at least thirty (30) days prior written notice to Carrier.  Such insurance may be furnished under any blanket policy carried by Contractor or under a separate policy therefor. Contractor shall furnish to Carrier the most current certificates of insurance for such policies.  Carrier shall be named as an additional insured on Contractor's policy.  Contractor acknowledges that its worker's compensation or occupational accident insurance shall be its sole source of recovery and that no claim to Carrier's own worker's compensation policy exists at any time during the term of this contract.

c.    Purchase of Policy through Carrier.  In the event Contractor purchases the worker's compensation and/or occupational accident insurance above, through the Carrier for the Contractor's convenience, Contractor shall pay the premiums therefor in advance to Carrier.  Such premiums shall be refundable only to the extent allowed under the terms and conditions of the insurance policy.  If Contractor fails to pay Carrier the premium for such policy when due, Carrier shall make the necessary set-offs and deductions pursuant to paragraph 22-23 below. Carrier shall furnish to Contractor the most current certificates of insurance for all such policies purchased through Carrier, and Carrier shall otherwise comply with the requirements of 49 C.F.R. §376.12(j)(2) or any successor regulations.

JBHI000270

GT

P 11/25

d.    Disclaimer. With respect to the insurance policy purchased through the Carrier for the Contractor's convenience pursuant to Paragraph (c) above, Contractor understands and agrees that Carrier is not an agent of nay insurance company that may issue such insurance coverage.  CONTRACTOR UNDERSTANDS AND AGREES THAT CARRIER DOES NOT MAKE ANY REPRESENTATION THAT ANY INSURANCE OFFERED TO CONTRACTOR BY CARRIER IS ADEQUATE TO COVER CONTRACTOR'S EXPOSURES.  Under no circumstances shall Contractor attempt to hold Carrier responsible for any failure on the part of any insurance company to honor the terms and conditions of any policy Contractor may purchase through Carrier.

15.  Purchase of Items from Carrier:  Contractor is not required to purchase or rent any products, equipment, or services from Carrier as a condition of this Agreement.  Any product, equipment, or service which Contractor elects to purchase or rent from Carrier shall be set forth with specificity in this Agreement and Appendix B and C hereto.

16.  Shortage, Loss or Damage to Cargo:  Contractor will be responsible for the loading and unloading of freight under this Agreement, and shall be compensated in the event of hand loading or unloading in accordance with Appendix B. Contractor is responsible for making sure the freight is properly counted and is in apparently good condition when loaded and is responsible for viewing the freight when being unloaded.  If there is any loss, shortage or damage of the freight when in Contractor's possession, Contractor shall indemnify Carrier as specified in Paragraph 20 of this Agreement.  In the event of any such claim, Carrier will deliver to Contractor a written explanation and itemization of any deductions for cargo or property damage made from Contractor's compensation prior to taking such deduction from Contractor's compensation.

17.  Trailers:  In the event either Carrier or a customer provides a trailer for the use of Contractor in providing its transportation services, Contractor shall inspect the trailer for prior damage and

JBHI000271

P 12/25  GI

road worthiness. If Contractor notices any damage to the trailer or road unworthiness, Contractor shall immediately notify Carrier. Contractor shall not commence operation until the problem has been repaired. Any physical damage to the trailer while in the possession of Contractor will be assessed to Contractor if no notification has been presented to Carrier, except as provided under Paragraph 18 of this Agreement. The parties acknowledge CDL drivers are required to inspect all equipment including trailers before commencing transportation. Upon notification, Carrier will cause repairs to the trailer to be made as soon as possible.

18. **Fines, Penalties, Court Costs:** Contractor will reimburse Carrier for the actual cost to Carrier of all fines, penalties and reasonable attorney fees and costs resulting from Contractor's improper operation of the Equipment. Contractor will notify Carrier if it has an overweight load so that corrective action may be taken. Except when the violation results from the acts or omissions of Contractor, Carrier shall assume the risks and costs of fines for overweight and oversized trailers when the trailers are preloaded, sealed, or the load is containerized, or when the trailer or lading is otherwise outside of Contractor's control and for improperly permitted over-dimension and overweight loads and shall reimburse the Contractor for any fines paid by Contractor. Contractor shall assume responsibility for inspecting and weighing all loads prior to departure to ensure that the trailers are loaded and otherwise in accordance with all applicable law and regulations. Any penalties or fines resulting from Contractor's failure to undertake such responsibilities promptly and properly or failure to take appropriate action to bring the loads and trailers in compliance with all applicable law and regulations, including fines and penalties for overweight trailers shall be deemed to be the obligation of Contractor, if such action is within the control of Contractor.

19. **Administrative Costs:** Contractor agrees to pay to Carrier a fee of $50.00 per year to compensate Carrier for the cost of qualifying contractor's drivers under US DOT regulations as set forth in paragraph 10 of the lease. Further, Contractor agrees to bear the costs associated

JBHI000272

P 13/25.    G T

with monies advanced to Contractor in accordance with paragraphs 22 and 23 of this Agreement.

20. <u>Indemnification:</u>  Contractor agrees to indemnify, defend, save and hold harmless Carrier from any and all claims, fines, or other expenses (including reasonable attorney fees) imposed by reason of Contractor's (or Contractor's employee's or driver's) wrongful actions, wrongful omissions, negligence, or wrongful violation of the terms of this Agreement, when such expenses are based upon the following: damage to property; any violation by Contractor of USDOT regulations or those regulations of any state or local authority; the loss, shortage, or damage to cargo while in Contractor's possession; the damage to owned trailers while in the Contractor's possession.  When any claim, fine, or other expense for which Contractor must indemnify Carrier is covered by Carrier's insurance, Contractor will only have to indemnify Carrier for the amount of the insurance deductible that Carrier actually pays for such covered expense, minus any related insurance proceeds due Carrier.  The provisions of this paragraph are subject to the exceptions contained in Paragraph 18 above.  This indemnification shall apply to the first <u>$500.00</u> of any cargo loss and to the first <u>$1,500</u> per occurrence for property damage and personal injury resulting from preventable accidents.

21. <u>On-Board Communications</u>:  A portion of the cost of establishing and maintaining on-board communications between Carrier dispatch and the leased unit shall be borne by the Contractor.  Carrier's customers require each owned or leased tractor to carry compatible on-board equipment which Contractor, at its option, may purchase, install and maintain.  If Contractor elects to rent such equipment from Carrier, Contractor will reimburse Carrier in accordance with paragraph 23.  Carrier's duties and obligations with respect to on- board communication devices are set forth in Appendix E.

22. <u>Charge-Back Items:</u>  Carrier may, at its option, advance monies directly to Contractor for the benefit of Contractor, including advances for single state registration, fuel, fuel advances, cash advances, and repair costs. Contractor hereby agrees that Carrier may deduct from

JBHI000273

P 14/25   GI

Contractor's compensation the costs of fuel advances, cash advances, and cash advance charges and items which Contractor elects to purchase or rent from Carrier pursuant to paragraph 15. Contractor further agrees that Carrier may deduct from Contractor's compensation for shortage, loss and damage to cargo that Contractor is responsible for under Paragraph 16, for damage to trailers that Contractor is responsible for under Paragraph 17, for re-powering and abandoned trailer recovery costs that Contractor is responsible for under Paragraph 12, for indemnification in accordance with paragraph 20, and for insurance charges that Contractor is responsible for under Appendix C. Contractor further authorizes Carrier to deduct whatever amount is required by law in the event of a garnishment or attachment. Carrier is authorized to deduct for any federal, state or provincial taxes, fines, or benefits that Carrier is required to pay as a result of Contractor's failure to comply with the terms of this Agreement. Carrier is authorized to deduct the replacement cost of any equipment issued by it to Contractor which is lost or destroyed and the repair cost for damaged items. Other miscellaneous charge-back items and the amount of authorized deductions are set forth in Appendix B. The computations of the above deductions are stated in Paragraph 23 below.

23.  Computation of Deductions/Copies:  All deductions from Contractor's compensation shall be equal to the exact net amount paid by Carrier and charged by the provider of the item charged, minus any related rebates, discounts, or refunds due Carrier. The computation of deductions will be made as follows:

    a.  Cash Advances Requested by Contractor. Carrier pays a fee for each transaction requested by Contractor (or its driver). The amount to be deducted from Contractor's compensation for each advance will be the amount of the advance plus the provider's transaction charge, which is currently $1.20 plus an $8.80 administrative charge. Should the transaction provider alter its fee, Carrier shall provide Contractor written notice of the amount of the new charge before such new amount is deducted from Contractor's compensation.

JBHI000274

P 15/25    G I

b.    Driver Qualifications/Related Administrative Costs.  Carrier will deduct from Contractor's compensation the exact net amount paid by Carrier and charged by the provider(s) of driver qualification services, less any related rebates, discounts, or refunds due Carrier.  Carrier will also deduct 15% of such net amount as an administrative fee.  Such driver qualification services and fees are as follows:

No driver qualification fees will be charged under this agreement.

c.    Insurance.  The amount of any insurance premium to be charged back to Contractor shall be shown on Appendix C.

d.    On-board Communications.  The charge to Contractor for onboard communications which is installed and maintained by Carrier shall be $25.00 per month for a 3-piece unit and $50.00 per month for a 2-piece unit, deducted from Contractor's weekly settlement.

e.    Fines/Penalties/Court Costs.  The amount of chargeback for costs and expenses to Carrier within the limitations of Paragraphs 18 and 20 of this Agreement shall be the exact net amount paid by Carrier and imposed by the charging authority, minus any related rebates, discounts, or refunds due Carrier.  The amount of reasonable attorney fees and costs due Carrier under Paragraphs 18 and 20 shall be equal to the actual fees and costs paid by Carrier in connection with the particular court proceeding.

f.    Shortage, Loss and Damage.  The amount for shortage, loss or damage to freight that Contractor must pay to Carrier pursuant to Paragraph 20 of this Agreement shall be equal to the exact net amount paid by Carrier, minus any related rebates, discounts, or refunds due Carrier and subject to the per occurrence limitations set forth above.  When any claim, fine, or other expense for which Contractor must indemnify Carrier under Paragraph 20 is covered by Carrier's

JBHI000275

P 16/25   GI

insurance, Contractor will only have to pay to Carrier the actual cost to Carrier for such covered expense, minus any related insurance proceeds due Carrier. The amount of reasonable attorney fees and costs due Carrier under Paragraph 20 shall be equal to the actual fees and costs paid by Carrier in connection with the particular court proceeding. Contractor's maximum liability is $500 per incident.

g.      Repowering/Recovery of Trailers.  The repowering charge will be computed by the actual amount paid to driver/contractor to reposition its equipment and deliver the freight to the customer pursuant to Paragraph 12(d) of this Agreement.  The abandoned trailer recovery charge pursuant to Paragraph 12(e) of this Agreement will be computed by actual cost to Carrier to recover the abandoned trailer.

h.      Base Plates and Single State Registration.  Carrier shall pay the costs associated with base plates and compliance with single state registration.

i.      Other Charge-Back Items.  For any additional charge-back items specifically authorized under the terms of this lease, but not specifically enumerated in this paragraph, the computation of the deduction and the calculation method of said deduction will be the exact net amount paid by Carrier and charged by the provider of the item charged, minus any related rebates, discounts, or refunds due Carrier.  Carrier may make deductions for operating taxes on an accrual basis.

j.      Copies.  Upon request, Carrier will provide Contractor with all documentation supporting the validity of the charge-back items under the terms of this Agreement, and the validity of all deductions taken from Contractor's compensation.

k.      Equipment Purchase Agreement.  If Contractor has elected to acquire ownership of the subject equipment through a lease purchase agreement with

JBHI000276

P 17/25    GI

Carrier or its affiliate or through a sublease guaranteed in whole or in part by Carrier, the terms and conditions of that agreement will be attached as Appendix F and incorporated by reference. *Note: Additional chargeback items may be set forth in Appendix B if applicable.*

24. <u>Escrow Funds:</u>  Carrier may require an escrow fund under the following terms:

    a.    <u>Amount</u>.  The minimum amount of the escrow fund or performance bond which Carrier may require from Contractor is <u>$1,500.</u>

    b.    <u>Specific Items</u>.  The specific items for which Carrier may deduct from the escrow fund under the terms of this lease are those items specified in the <u>Chargeback</u> and <u>Computation of Deductions</u> Paragraphs and Appendix B and C of this lease. The failure of Carrier to take monies from such fund for the benefit of Contractor will not be waived by Carrier if Carrier does not deduct those amounts from previous settlements.

    c.    <u>HVUT Set-Off</u>.  Notwithstanding Contractor's obligation to pay the Federal Highway Vehicle Use Tax as required under Paragraph 12(h) above, Contractor and Carrier hereby agree that Carrier shall file and submit payment on behalf of Contractor for such tax.  In order to submit payment for the Federal Heavy Vehicle Use Tax, Carrier shall set-off additional amounts from IC Compensation as set forth in the Compensation and Fee Schedule over a period of time leading up to the filing date as may be necessary until the required amount to pay such tax has been accumulated and deposited in the Escrow Funds.

    d.    <u>Right to Replenish Funds</u>.  In the event Escrow Funds are reduced below the required balance as a result of deductions made therefrom pursuant to the terms of this agreement, Carrier shall have the right to replenish the Escrow Funds by setting off amounts from compensation due Contractor over a period of time as

JBHI000277

P 18/25   *GI*

may be necessary to reach again the required balance at the rate of $100.00 per week.

e.    Accountings.  While the escrow fund is under the control of Carrier, Carrier shall provide an accounting to the Contractor of any transaction involving the escrow fund by clearly indicating in individual settlement sheets the amount and description of any deduction or addition made to the escrow fund. Furthermore, the Contractor has the right to demand at any time an accounting of any transactions involving the escrow fund.

f.    Interest.  While the escrow fund is under the control of Carrier, Carrier shall pay interest on the escrow fund on at least a quarterly basis.  For purposes of calculating the balance of the escrow fund on which interest must be paid, Carrier will deduct a sum equal to the average advance made to the Contractor during the period of time for which interest is paid.  The interest rate shall be established on the date the interest period begins and shall be at least equal to the average yield or equivalent coupon issue yield on 91 day, 13-week Treasury bills as established by the Department of Treasury at the beginning of the quarter.

g.    Return of Escrow Fund.  At the time of the return of the escrow fund, Carrier may deduct monies for those obligations incurred by the Contractor which have been previously specified in this lease, and Carrier shall provide a final accounting to the Contractor for all such final deductions made to the escrow fund. In no event shall the escrow fund be returned later than 45 days from the date of termination of this lease.

h.    Excess Funding.  Contractor at its election may deposit funds above the required escrow minimum with Carrier for Contractor's unrestricted use.  Carrier will fully comply with Section (a) through (e) with respect to such funds reserving its full rights of deduction.

P 19/25    GI

25. <u>Identification of Equipment and Return of Identification Upon Termination:</u>  During the period of the lease, and while the equipment is being operated on behalf of Carrier, the equipment shall be identified in accordance with all applicable federal regulations.  Contractor agrees that upon termination of this Agreement, Contractor will promptly return all placards and will no longer operate its equipment under Carrier's authority from the USDOT or other state agencies.  If Carrier's identification numbers are "painted," Contractor will warrant or exhibit to Carrier or its agent that the painted numbers have been removed from the equipment.  Contractor warrants it will not perform motor carrier service under Carrier's USDOT operating authority or have Carrier's USDOT numbers or state numbers on the equipment as working for Carrier while not dispatched by Carrier.  Upon termination of the lease, Carrier may withhold final payment to Contractor until Contractor either returns the above-referenced identification devices, or sends a letter to Carrier certifying that such devices have been lost or stolen.  If Contractor does not provide Carrier with a receipt for the equipment upon termination and either return the above-described identification devices or offer evidence that painted signage has been removed, Carrier shall have the right to immediate possession of the equipment to secure removal of signage and Contractor shall bear all reasonable cost, including attorney's fees to accomplish this result.

26. <u>Surrender of Possession at Termination:</u>  In the event of breach or default by Contractor of its obligation to surrender possession of any trailer, base plate, or equipment as reflected in Appendix B, Contractor shall be liable to Carrier for all expenses and damages including, but not limited to, attorney's fees, court costs and loss of use, incurred by Carrier in reacquiring possession.  In the event Contractor retains custody of property of Carrier or otherwise fails or refuses to deliver possession thereof to Carrier, upon demand or upon termination of this Agreement, in addition to any other remedies available to Carrier, Contractor shall be liable to Carrier in the amount of Fifty Dollars ($50.00) for each day or portion thereof that the item is

JBHI000279



P 20/25  GI

not returned to the actual or constructive possession of the carrier, not as a penalty, but as liquidated damages to cover the cost to Carrier of the loss of use.

27. <u>Condition Upon Surrender of Possession</u>:  Contractor agrees it will surrender possession of items to Carrier in as good a condition as they were when Contractor received them, normal wear and tear from use excepted.

28. <u>Effect of Termination</u>:  Upon termination of this Agreement as to any or all tractors leased hereunder:

    a.    Contractor shall do all of the following:  (A) submit to Carrier all necessary delivery documents and other paperwork showing full and proper performance of all trips, (B) all identification, permits, plates and decals of Carrier on each tractor shall have been removed by Contractor and returned to Carrier in accordance with the provisions of paragraph 26 above, or if such identification, permits, plates and decals have been lost or stolen, Contractor shall have given written notice to Carrier certifying that same have been removed from the tractor, (C) any OBC shall have been returned to Carrier in accordance with the provisions of paragraph 21 above, (D) all E-Z Pass and toll cards have been returned to Carrier and (E) any other Carrier-issued equipment utilized by Contractor shall have been returned to Carrier in accordance with the provisions of paragraph 12 above.

    b.    Notwithstanding anything contained in paragraph 28(a) above to the contrary, and without affecting Carrier's rights under paragraph 20 above, the final IC compensation settlement, and funds on deposit in the Escrow Funds, shall be paid and disbursed to Contractor within forty-five (45) days of termination. Carrier shall provide Contractor with an accounting of all such final settlements and disbursements, and any set-offs and deductions thereto, as to any or all tractors so terminated.

JBHI000280

P 21/25    G I

c.    Neither party hereto shall, by reason of the termination of this Agreement as to any or all tractors leased hereunder or otherwise, be liable to the other for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated revenues or on account of any expenditures, investments or commitments made in connection with the business or goodwill of Contractor or Carrier or for any other loss arising by reason of the termination hereof.   Any effect of termination on Contractor's rights with respect to any lease/purchase options concerning involved equipment will be set forth in Appendix C.

29.  Assignment:  This Agreement is not assignable by either party without the written consent of both parties.

30.  Entire Agreement:  This Agreement, and Appendices A-E, constitute the entire agreement and understanding between the parties and shall not be modified, altered or changed without the express written consent of both parties.

31.  Waiver:   No waiver by Contractor or Carrier of any provision of this Agreement shall be deemed to be a waiver of any other provision hereof.

32.  Multiple Copies:   This Agreement is made in multiple copies.  Contractor shall keep one (1) copy for himself or herself, and keep one (1) copy in the equipment at all times while operating under dispatch for Carrier.

33.  Jurisdiction and Venue:   This Agreement is executed in Arkansas and any legal proceeding, whether state or federal, involving this Agreement shall be brought in the State of Arkansas.

**J.B. HUNT TRANSPORT, INC.**              **INDEPENDENT CONTRACTOR**

Signature: _John McK___              Signature: _____

Printed Name: John McKuin_____              Printed Name: _Girik Issaia__

Title: Vice President of Operations_              Date: _4 - 6 - 2011_

JBHI000281

P 22/25   *G.I.*



### J.B. Hunt Transport, Inc.
#### Intermodal Addendum To The
#### Intermodal Independent Contractor Operating Agreement

**THIS ADDENDUM** is made to the Independent Contractor Operating Agreement ("IC Agreement"), dated _04/06/2011_ between J.B. Hunt Transport, Inc. ("Carrier") and _Girik Issaian_ ("Contractor"). The terms of this Addendum shall be effective upon the _04-06-2011_.

**WHEREAS,** Contractor has agreed to provide transportation services for Carrier as an independent contractor; and,

**WHEREAS,** Carrier and Contractor have agreed that such services are to be rendered strictly at one or more of Carrier's Intermodal **Locations.**

**NOW, THEREFORE,** Contractor and Carrier agree that the following terms and conditions are hereby added to the IC Agreement:

1. Addendum:

    a. Appendix A - Any specific customer service expectations with which Carrier is bound to comply at any Intermodal locations shall be attached as an Appendix A to this Addendum. As Contractor may be required to perform services at one or more Intermodal locations each Appendix A shall name the location to which it applies. Contractor shall comply with these customer services requirements in providing services to Carrier.

    b. Appendix B - The original IC Compensation table from Appendix B of the IC Agreement shall be superceded by project-specific IC Compensation Tables, copies of which shall be negotiated and attached to the Addendum as one or more Appendices B. Project-specific IC Compensation Tables are necessary since Intermodal negotiates varied rates of payment with each Intermodal customer. Therefore, each IC Compensation table will need to be negotiated separately to ensure that payment to Contractor falls within the parameters of Intermodal pricing models for each separate **location.**

2. All other terms and conditions of the IC Agreement remain unchanged hereby.

**J.B. HUNT TRANSPORT, INC.**          **INDEPENDENT CONTRACTOR**

Signature: _John McKuin_               Signature: _____

Printed Name: _John McKuin_            Printed Name: _Girik Issaian_

Title: _Vice President of Operations_   Date: _04/06/2011_

JBHI000282

P 23/25
GI

SS# ██████████

### J.B. Hunt Transport, Inc.
Intermodal Independent Contractor Operating Agreement

#### Appendix C: Insurance Appendix

This Appendix relates to the Owner/Operator Contract and Lease Agreement between J.B. HUNT TRANSPORT, INC. ("Carrier") and the Contractor named below:

Contractor is not required to purchase insurance from or through Carrier. In fact, Carrier desires Contractor to purchase insurance on its own and to provide certificates of insurance pursuant to the Agreement. If Contractor, at its option, desires to purchase any insurance through Carrier's independent agent, this Appendix must be signed by Contractor and Carrier.

Contractor desires to purchase the following insurance through Carrier's independent insurance agent and have Carrier advance the cost for the same. Contractor hereby authorizes Carrier to deduct from compensation otherwise owed to Contractor for this insurance. The calculation for the following insurance costs to the Contractor will be the exact net amount of the premium paid by the Carrier and charged by the insurer for that coverage, less any related rebates, discounts, or refunds due Carrier.

    a.    <u>Bobtail Insurance:</u> Contractor hereby agrees to pay $ _18.00_ per month for Bobtail Insurance.
           Initial if Yes _GI_
           Initial if No _____

    b.    <u>Physical Damage:</u> Contractor hereby agrees to pay $ _26.92_ per month for Physical Damage Insurance.
           Initial if Yes _CI_
           Initial if No _____

    c.    <u>Occupational Accident:</u> Contractor hereby agrees to pay $ _149.28_ per month for Occupational Accident Insurance.
           Initial if Yes _CI_
           Initial if No _____

Carrier will provide a copy of any such policy upon the request of Contractor. Carrier will provide a certificate of insurance for each such policy, including the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage. Contractor hereby authorizes Carrier to deduct from its compensation the amounts specified above.

| J.B. HUNT TRANSPORT, INC. | INDEPENDENT CONTRACTOR |
|---|---|
| Signature: _John McKuin_ | Signature: _____ |
| Printed Name: _John McKuin_ | Printed Name: _Girik Issaia_ |
| Title: _Vice President of Operations_ | Date: _04/08/2011_ |

JBHI000283

P 24/25

SS#_____

## J.B. Hunt Transport, Inc.
### Intermodal Independent Contractor Operating Agreement

### Appendix D:  General Savings Fund Authorization

Independent Contractor hereby authorizes to deduct, to the extent available, amounts from IC Compensation otherwise due Independent Contractor with respect to the tractor specified below in the manner set forth below and to deposit such amounts into the General Fund:

Tractor Number: 381720

Effective Date: 4/6/11

Deduction Amount:

Cents Per Paid Mile Per Week        $ .02

This General Savings Fund Authorization is entered into in connection with an Independent Contractor Agreement executed by Independent Contractor and J.B. Hunt Transport, Inc. The maximum balance in the General Savings Fund at any time will be limited to $10,000.

**Independent Contractor**

_____
(Signature)

Gınik Essaian
(Typed or Printed Name)

04-08-2011
(Date)

P 25/25

SS# ████████

## J.B. Hunt Transport, Inc.
### Intermodal Independent Contractor Operating Agreement

#### Appendix E: On-Board Computer (OBC) Operations

1. <u>Non-Use While in Motion</u>: Contractor hereby represents to Carrier that the OBC will not be used while tractor is in motion. If, and only if, a tractor is being operated by a team, then the non-driver may use the OBC while the tractor is in motion.

2. <u>Maintenance</u>: Contractor shall protect the OBC from damage and abuse so as to keep the OBC in good repair, condition and working order during the term of this agreement, normal wear and tear excepted. Carrier will at its own cost and expense, repair or replace a damaged or defective OBC. Contractor shall promptly notify Carrier of any problems associated with the OBC.

3. <u>Risk of Loss</u>: Contractor shall bear the entire risk of loss, damage or destruction of the OBC resulting from any theft, fire, accident or other casualty whatsoever. Contractor shall promptly notify Carrier of any such loss. Contractor shall pay Carrier the amount as set forth in the compensation and fee schedule for any such loss.

4. <u>OBC Return</u>: Upon termination of this Agreement for any reason:

   (a) Contractor shall deliver the tractor to such point as requested by Carrier for removal of the OBC. Contractor shall return OBC in the same condition as when received, normal wear and tear excepted.

   (b) In the event Contractor fails to return the OBC within (3) days of termination, Contractor agrees to pay Carrier the liquidated damages as set forth in Appendix B of the Agreement. Carrier reserves the right to deduct such amount from Contractor's escrow funds as necessary to satisfy this obligation.

   (c) In the event Contractor fails to return the OBC as requested, Carrier shall be entitled to receive the costs and expenses (including reasonable attorneys' fees) incurred by Carrier in recovering such OBC. Carrier shall make the necessary set-offs and deductions as required.

Date OBC Received by Independent Contractor: 4/6/ ,20 11 .

Type of Unit Installed: _____ (2 Piece)    X  (3 Piece).

Acknowledgement of Receipt of OBC: _____
                                      (Contractor Signature)

                                   Cirik Issuian
                                   (Typed or Printed Name)

JBHI000285

 

P 1/8

## J.B. Hunt Transport, Inc.
### Intermodal Independent Contractor Operating Agreement

#### Appendix A: Service Requirements

To the Intermodal Addendum to the Independent Contractor Operating Agreement. This Appendix A applies to services render at the Intermodal location of **South Gate, CA** and shall be effective the 04/06/, 2011.

In addition to any service expectations set out in the IC Agreement, listed below are customer service expectations that Contractor shall meet in servicing Carrier's transportation needs at the above-named Intermodal location.

#### I. Service Standards

Contractor shall comply with any additional service standards as set out in Article VI of the transportation agreement between Carrier's Intermodal group and the Intermodal customer. That agreement states:

"1.    Carrier shall transport such shipments as Shipper may require by motor vehicle from and to such points between which service may be required, without delay, subject to the availability of suitable equipment for the traffic offered and the specific shipment instructions, all in accordance with the terms and conditions of this Contract and Appendices.

2.    Carrier will accept tender of shipments as directed by Shipper and transport and deliver such shipments promptly and efficiently. Carrier shall perform loading and unloading services as required by Shipper and agreed to by Carrier. Each shipment shall be evidenced by a bill of lading or other receipt. Such bill of lading or receipt is to be signed by Carrier and will show the kind, condition and quantity of commodities received and delivered by Carrier at the loading and unloading points,

3.    Carrier understands and agrees in performing services under this Contract that time is of the essence in the pickup, transportation and delivery of individual shipments and that it agrees to meet all prearranged pickup and delivery times."

#### *On Time Service Percentage*

**Business which is handled by J.B. Hunt Transport, Inc. Intermodal group shall provide 98% on-time performance. Drivers will be put on probation after two service failures within a quarter. The third service failure during the next six month period immediately following the second service failure will result in the termination of the contract.**

**All Service Failures will be measured and reported with proper reason codes. Service Failures resulting from driver error or mechanical will be classified as JB Hunt failures, which affect the contracted service percentage. Failures resulting from shipper or receiver delays, railroad, dispatch error, weather, abnormal traffic flow, and/or other Acts of God, will be measured but not included in the contracted service percentage.**

Initials: _____    Initials: _____
For:    **J.B. Hunt Transport, Inc.**    For:    **Independent Contractor**

JBHI000286

P 2/8  GI

### J.B. Hunt Transport, Inc.
#### Intermodal Independent Contractor Operating Agreement

#### Appendix A: Service Requirements

II. Provision of Proof of Delivery

Contractor shall provide Carrier with copies of signed bills of lading and signed delivery receipts as evidence of the complete performance of such services.

III. Refused and Rejected Shipments

In order to comply with the Intermodal customer requirements set out under Article XI(2) Contractor shall adhere to the following procedures. When a shipment is refused or rejected by the consignee, or Contractor is unable to deliver it for any reason, Contractor shall notify Carrier in order to receive disposition instructions Contractor shall provide constant and sufficient security and safety for the shipment until such disposition instructions are received.

IV.    Confidentiality

Contractor hereby agrees, to the extent he becomes aware of any terms of the relationship between Carrier and the Customer, to be bound to the terms of confidentiality to which Carrier is bound.  They are:

"Without the express written consent of the other party, no party shall disclose the terms of this Contract or Appendices to any third party, except (a) as required by law or regulation, (b) to an authorized audit agency designated by a party for audit purposes or (c) to an affiliate or potential affiliate of a party."

V.    *The following are additional factors affecting service derived from customer requirements and expectations established in the Intermodal transportation agreement:*

*Primary Traffic Lanes or areas of Service: Within a 125 mile radius of South Gate, CA*

*Supervisory Hours of Operation: 24 hours a day/7 days a week*

*Supervisory Responsibility for non-dedicated deliveries: 24 hours a day/7 days a week.*

*Loading Hours: 24 hours a day 7 days a week.*

*Operating Days per year: 365 days*

*Delivery Hours: 24 hours a day/7 days a week*

| Initials: | | Initials: | |
|---|---|---|---|
| For: | J.B. Hunt Transport, Inc. | For: | Independent Contractor |

JBHI000287

P 3/8    

### J.B. Hunt Transport, Inc.
#### Intermodal Independent Contractor Operating Agreement

#### Appendix B: Compensation and Fees

To the Intermodal Addendum to the Independent Contractor Operating Agreement.  This Appendix B applies to services render at the Intermodal location of __South Gate, CA__ and shall be effective __09 06__, 20 11 .

| | |
|---|---|
| Linehaul-Loaded (Per Mile) | $0.85 |
| Linehaul-Empty (Per Mile) | $0.85 |
| Hand Load/Unload | N/A |
| Stop-Offs | N/A |
| Pick-up / Delivery (Drop/Hook) | $45 |
| Pick-up / Delivery (Live) | $65 |
| Otay Mesa, CA Border Repowering of Load | $45 |
| | |
| Empty Trailer Reposition | $30 |
| Hazmat Load | $10 |
| Customer Refused Load | $65 |
| Truck Ordered Not Used (TONU) | $30 |
| Safety Training | $30/Hour |
| Layover Pay (Each 24 Hours Excluding Weekends) | N/A |
| Driver Orientation (Per Truck) (After 4 days holdover rate is $50/day) | $75/Day |
| Orientation Mileage | N/A |
| Fuel Surcharge  (Revised 2-18-03) | Surcharge Schedule |
| Tolls | Carrier Paid |
| Base Plates | Carrier Paid |
| Permits | Carrier Paid |
| Scales | Reimbursed |

Initials: _____    Initials: _____
For:    J.B. Hunt Transport, Inc.    For:    Independent Contractor

P 4/8    *GI*

### .B. Hunt Transport, Inc.
**Intermodal Independent Contractor Operating Agreement**

**Appendix B: Compensation and Fees**

**Fees, Charges, Balances and Other Amounts**

Pursuant to the applicable provisions of the Independent Contractor Agreement, Independent Contractor shall be liable for the fees, charges, balances and other amounts as set forth in the table below, including, but not limited to the following:

| | |
|---|---|
| Truck Lease/Purchase Payment | NA |
| Independent Contractor-Initiated Re-Power: Minimum Charge | $50 |
| Non-trucking Liability Insurance (Single Limit) | $1,000,000 |
| Preventable Loss: Personal Injury/Property Damage | $1,500 |
| Preventable Loss: Cargo Shortage/Damage | $500 |
| Escrow Funds: Required Balance | $1,500 |
| Escrow Funds: Minimum Weekly Set-Off for Required Balance | $50 |
| Escrow Funds: Minimum HVUT (2290) Set-Off | $550/Year |
| Annual Administrative Fee | No Charge |
| Fuel Use/Tax Reserve (per Carrier Directed Mile) | $0.01 |
| Miscellaneous Equipment Issued to Independent Contractor | Equipment Value |
| OBC Monthly Usage Charge | $25 |
| OBC Replacement Value | $2,000 |
| OBC Daily Liquidated Damages (Improper Turn-In) | $50 |
| OBC Maximum Liquidated Damages (Improper Turn-In) | $2,000 |
| Failure to Return Decals/Permits/Plates: Daily Liquidated Damages | $50 |
| Road Service Fee (Tractor Maintenance) | $20/Event |
| Annual Motor Carrier Property Tax (AR, KS, KY, TN) | $55/Year |
| | |
| | |
| | |

Initials:    for:    J.B. Hunt Transport, Inc.

Initials:    *GI*
For:    Independent Contractor

JBHI000289

P 5/8 

## J.B. Hunt Transport, Inc.
### Intermodal Independent Contractor Operating Agreement

### Appendix B:  Compensation and Fees

**Miscellaneous**

A.  **Carrier's Right to Modify or Terminate**

Independent Contractor specifically understands and agrees that Carrier, in its sole discretion, shall have the right to modify or terminate from time to time the compensation rates as set forth in Part I of this Schedule and the fees and related amounts set forth in Part II of this Schedule. Carrier shall give Independent Contractor not less than thirty (30) days written notice prior to the effective date of any such change with the exception of the fuel surcharge payment which will vary at the discretion of the Carrier. The terms of this document supercede any previously executed agreement.

Initials:                                     Initials:
or:      **J.B. Hunt Transport, Inc.**       For:       **Independent Contractor**

JBHI000290



P 6/8    GJ

## J.B. Hunt Transport, Inc.
### Intermodal Independent Contractor Operating Agreement

#### Appendix B: Compensation and Fees

__Detention Schedule__

Contractor will be eligible for compensation (detention) in the event that he/she is detained longer than 1.5 hours at a customer.  Contractor will be paid following his arrival or customer appointment time, whichever comes last.  Contractor becomes ineligible if JBHT is unable to charge the customer detention *due to a driver related service failure.*  After 1.5 hours of detention, pay is $30.00 per hour excluding any time the driver is legally required to be off duty or taking a 10 hour break.   All detention pay will be paid in 15 minute increments and administered as follows:

| Detention Minutes Incurred | Detention Hours Paid |
| --- | --- |
| 0-7 minutes | 0 hours |
| 8-22 minutes | ¼ hour the hourly rate |
| 23-37 minutes | ½ hour the hourly rate |
| 38-52 minutes | ¾ hour the hourly rate |
| 53-60 minutes | 1 hour |

CARRIER:
J.B. Hunt Transport, Inc.

_(Signature)_  John McKuin

_(Printed Name)_

VP Intermodal Operations
_(Title)_

4/8/11
_(Date)_

INDEPENDENT CONTRACTOR:

_(Signature)_

Girik Issaian
_(Printed Name)_

INDEPENDENT CONTRALTOR
_(Title)_

04/06/2011
_(Date)_

JBHI000291

**J.B. Hunt Transport, Inc.**
<u>Intermodal Independent Contractor Operating Agreement</u>

This agreement is made this ___8___ day of ___August___, 20_11_

between _Girik Issaian_ as "Contractor" and J.B. HUNT TRANSPORT, INC., as "Carrier," and shall begin on the date and time appearing on Appendix A. This agreement shall end at midnight exactly one year from the start date appearing on Appendix A. In consideration of the mutual promises made in this agreement, Contractor and Carrier agree as follows:

<u>PREAMBLE</u>

J.B. HUNT TRANSPORT, INC. is a motor carrier authorized to transport freight in interstate and intrastate commerce. Contractor is the owner of motor vehicle equipment which Contractor desires to lease to Carrier with qualified driver(s). The parties acknowledge this Lease must follow certain regulations of the United States Department of Transportation ("USDOT") including, but not limited to, safety and leasing regulations. Contractor agrees to provide the motor vehicle identified below and a driver for that motor vehicle. The driver and the motor vehicle will be in compliance with all USDOT requirements. Carrier will pay Contractor in accordance with the terms of this Lease Agreement.

<u>AGREEMENT</u>

1.  <u>Identity of Parties:</u>

    Contractor is:

    Full Name: _Girik Issaian_

    Address: _[redacted]_

    Phone Number: _818 – 726 – 0762_

    SSN or FEIN No. if a corporation: _[redacted]_

1

JBHI000328

Carrier (also referred to as "JBHT") is:

J.B. HUNT TRANSPORT, INC.
615 J. B. Hunt Corporate Drive, PO Box 425
Lowell, Arkansas 72745
Phone: 479-820-0000

2.  Identification of Equipment to be Leased:  Contractor leases to Carrier the motor vehicle or vehicles described as follows:

**Tractor**

Year: _2004_

Make/Model: _FRT colombia_

State Registration: _INDIANA_

Vehicle Identification Number: _1FUJABCK841M60893_

3.  Receipt of Equipment:  The equipment which Contractor will lease to Carrier pursuant to the terms and conditions of this Agreement is identified in the attached Appendix A, which, when executed, will show the date and time of the receipt of the equipment by Carrier.  Upon termination of this lease, or when possession by Carrier of the equipment identified in Appendix A ends, Contractor shall give Carrier or its authorized representative a receipt evidencing the date and time of the return of the equipment to Contractor's control.

4.  Exclusive Use:  Contractor agrees neither it nor its drivers shall have authority to enter into any agreement for the use of the leased equipment covered by this Agreement for the benefit of any person other than Carrier without prior written consent of Carrier.

5.  Payment to Contractor:  Reference the Intermodal Addendum to the Independent Contractor Operating Agreement Attachment B.

6.  Time and Conditions of Payment:  Payment to the Contractor shall be made within fifteen (15) days after submission of the necessary delivery documents, logbooks required by the USDOT, and those documents necessary for Carrier to secure payment from the shipper,

2

JBHI000329

which are the bill of lading, signed delivery receipt or other proof of delivery acceptable to Carrier. Payment of compensation to Contractor shall not be contingent upon submission of a bill of lading to which no exceptions have been taken. In the case of a C.O.D. shipment only, Contractor must deliver the certified check or money order due the Carrier and any other documents necessary for Carrier to secure payment from the shipper. Carrier shall provide Contractor with notice at the time of dispatch that the particular shipment is a C.O.D. delivery, specifying which documents are required to be delivered to Carrier.

7.  <u>Term and Termination:</u>    The term of this Agreement will commence upon execution and delivery of the receipt of equipment to Carrier, as reflected by Appendix A, and shall end at midnight one year later. It shall be renewed and extended automatically from year to year thereafter unless cancelled or terminated under the provisions of this Lease Agreement. Either party may terminate this Agreement upon 30 days written notice. Carrier may terminate this Agreement upon written notice or by on-board written transmission in the event of serious breach by Contractor. A serious breach shall be defined as (1) evidence of a felony committed while in operation of the leased equipment; (2) evidence of a chargeable personal injury accident; (3) violations of U.S. DOT safety regulations which imperil Carrier's safety rating; (4) unauthorized use of leased equipment; and (5) any breach of service obligations which imperil carrier's license, permits, insurance, or customer relations.

8.  <u>Exclusive Possession and Responsibilities:</u>    Carrier shall have exclusive possession, control and use of the equipment for the duration of the Lease. Carrier shall assume complete responsibility for the operation of the equipment for the duration of the Lease. Contractor specifically agrees it will not use the authorities, placards or vehicle identification numbers of Carrier to perform services for any other person, firm or company without having the express written consent of Carrier.

3

JBHI000330

9. <u>Status as Independent Contractor:</u>  At all times during the period this lease is in effect, Contractor shall be an independent contractor with respect to the transportation operations conducted on behalf of the Carrier.  Neither Contractor nor its employees are to be considered employees of Carrier at any time, except as may be specified by federal or state law.  Neither party is the agent of the other nor shall have the right to bind the other by contract or otherwise except as herein specifically provided.

10. <u>Driver Qualification:</u>  Contractor warrants that each driver of the Equipment shall be qualified to drive under USDOT regulations which require among other things the driver to have a validly issued Commercial Driver's License, health card and any other documentation required by the USDOT.  Contractor agrees that the person will not operate the Equipment during the term of this lease without first being qualified by Carrier.  Contractor acknowledges its driver must pass all of the USDOT tests, including drug and alcohol tests and agrees to submit to and bear the costs of such testing.  Contractor further agrees to be solely responsible for compensating its driver, including but not limited to, wages, withholding taxes, FICA, worker's compensation, overtime and any and all other costs associated with employing its driver.

11. <u>Carrier's Duty:</u>  During the term of this Agreement, Carrier agrees to make freight available to Contractor for transportation by Contractor; provided, however, Contractor understands and agrees that in no event shall Carrier guarantee to Contractor any specific number of miles or loads, any specific amount of freight or any specific times, dates or routes.

12. <u>Warranties of Contractor:</u>  Contractor agrees and warrants as follows:

    a.    <u>Contractor</u> is the owner of the equipment described in this lease, within the meaning of 49 C.F.R. §376.2(d).

    b.    <u>Equipment Warranties</u>.  The above-described equipment is in good condition and fully complies with all safety regulations and requirements of the

4

JBHI000331

USDOT and that Contractor will maintain such equipment in good condition and compliance during the term of this lease. Costs of all expenses to maintain that equipment in good and lawful condition in compliance with USDOT standards shall be borne by Contractor. The U.S. Department of Transportation Federal Motor Carrier Safety Regulations found at 49 C.F.R. 396 et seq. or any successor regulations specify that all motor vehicles subject to an independent contractor operating agreement be subjected to systematic inspections and repairs. Contractor hereby agrees that, pursuant to said regulations and at such times as Carrier may reasonably require, Contractor shall cause the Equipment to be inspected at such facilities as Carrier shall have approved (such approval not to be unreasonably withheld) and to effect needed repairs at Contractor's sole cost and expense. Contractor shall submit to Carrier records of inspections, repairs and maintenance as required by Federal Safety Regulations.

c.    Expenses. Contractor shall bear the operational expenses incurred in performing the transportation services requested by Carrier under this lease agreement. Those expenses are limited to: all fuel, oil, tires and equipment, accessories, or devices used in connection with the operation of the equipment; maintenance costs including repairs; taxes and assessments, fuel and fuel use taxes; fines and penalties resulting solely from the acts or omissions of Contractor and its employees; insurance costs relating to insurance coverage required to comply with this agreement; federal highway use tax on the equipment; federal, provincial, state or city income taxes, and any self-employment or payroll taxes; and any sales, use, excise and other taxes due and owing to ownership or operation of the equipment. Contractor shall also bear any expenses necessary to maintain the equipment in compliance with all applicable federal and state safety laws and regulations. Contractor shall be responsible for all costs associated with

5

JBHI000332

detention, loading and unloading. Carrier will compensate Contractor for such services in accordance with the schedule set forth in Appendix B. Upon termination of this lease if there are any costs associated with unused portions of any of the above referenced operational expenses, those costs shall be borne by Contractor unless otherwise specified in this lease.

d.    Services and Compliance.  Contractor agrees to transport the freight tendered to it by Carrier from point of origin to point of destination in a reasonable and timely manner.  If Contractor does not or cannot complete the load, Contractor will be responsible for the costs of repowering the load – unless Carrier's acts or omissions have caused Contractor's inability to complete the load.  Contractor and its drivers shall comply with all laws, rules and regulations of the USDOT and other federal, state and local governmental agencies.  Nothing contained herein shall require the Contractor to violate the safe transportation of the equipment or the hours-of-service rules of the USDOT, and Contractor may refuse to transport the freight tendered to it by Carrier if Contractor believes that the transportation would result in such violation.

e.    Use of Carrier Equipment.  Contractor will be responsible for Carrier's actual costs in recovering any "non-owned" trailer for which Contractor has accepted dispatch and which he/she has also wrongfully abandoned.  For the purposes of this Agreement, a "non-owned" trailer is a trailer that either Carrier or Carrier's customer has provided to Contractor for providing his/her transportation services for Carrier.  In the event Contractor uses the trailers for any other purpose, Carrier shall, in addition to any other remedies, be entitled to liquidated damages for the loss of use of each such trailer in the amount of twenty cents ($0.20) per mile of unauthorized use plus fifty dollars ($50.00) for each day, or portion of a day, of such unauthorized use.  Unauthorized use of the trailers shall

6

JBHI000333

constitute a material breach of this Agreement.  Carrier shall have the right to deduct the amount of such liquidated damages from the Contractor's settlements or escrow funds.

f.      Service Standards.  Contractor shall perform freight transportation services in compliance with all applicable laws and regulations and further shall make every reasonable effort to perform freight transportation services hereunder in a prompt, competent and diligent manner consistent with Carrier's standards of customer service and satisfaction.  Contractor shall immediately report to Carrier any disagreements, altercations or other circumstances or disputes involving shippers or their agents, employee or consignees that would tend, in any way, to detract from the quality and reliability of Carrier's service or to damage Carrier's reputation.

g.      Acceptance of Loads.  Contractor shall have the right to reject any shipment tendered to it by Carrier.  When Contractor accepts a shipment tendered to it for transportation, Contractor agrees to perform its services hereunder in such a manner as to satisfy the requirements of Carrier's customers including, but not limited to, complying with pick-up and/or delivery dates and times specified by Carrier's customers and by complying with the Carrier's operating policies and procedures.  The failure of the Contractor to fulfill this obligation will constitute a material breach of this Agreement.  Contractor agrees that it is liable and will reimburse Carrier for the entire amount of any claims paid by Carrier as the result of late delivery of shipments accepted by Contractor where such late delivery is the Contractor's fault.  Carrier shall have the right to deduct the amount of such claims from Contractor's settlements or escrow account.

7

h.    Taxes.

(1)    Income Taxes.  Contractor shall pay all taxes and fees (including penalties and interest) imposed by any Federal, Provincial, State or local government on account of the receipt of income by Contractor for freight transportation services rendered under this Agreement.  Contractor understands and agrees that Carrier shall not be required to withhold any income or other taxes imposed on income earned by Contractor hereunder and Contractor agrees to take any action necessary to ensure that Carrier is not subject to such a requirement. Contractor shall file all Federal, Provincial, State or local government tax forms and returns as required in connection with the receipt of income by Contractor and shall pay when due all taxes and contributions reported in such forms and returns. Contractor shall furnish Carrier with such evidence of compliance with the foregoing as Carrier shall reasonably request.

(2)    Operating Taxes.  Contractor shall pay all Federal Heavy Vehicle Use taxes, fuel taxes, road taxes, mileage taxes, property taxes and all other taxes and fees (including penalties and interest) imposed by any Federal, Provincial, State or local government related to the use and operation of the equipment leased by Contractor to Carrier hereunder.  Carrier will set aside funds from the Contractor's weekly settlement for this purpose and will reconcile actual Contractor liabilities on a quarterly basis.  Carrier will file all Federal and State government tax forms and returns as required in connection with the use and operation of the equipment hereunder.

(3)    Employment Taxes.  Contractor shall pay or withhold all employment-related taxes and fees and other related taxes and fees (including penalties and interest) imposed by any Federal, Provincial, State or local government by virtue of Contractor's status as an employer or sole proprietor, as

8

JBHI000335

the case may be. Contractor shall file all Federal, Provincial, State or local
government tax forms and returns as required in connection with its status as an
employer or sole proprietor and shall pay or withhold when due all taxes and
contributions reported in such forms and returns. Contractor shall furnish Carrier
with such evidence of compliance with the foregoing as Carrier shall reasonably
request.

        (4)    <u>Toll Operating Costs</u>. Carrier shall provide Contractor an
E-Z Pass to be permanently attached to the tractor for toll transactions in all E-Z
Pass participating states for the duration of this Agreement. Carrier shall also
provide toll charge cards to Contractor for other states as needed. Carrier will
deduct $28 from Contractor as a deposit for the E-Z Pass and $5 for each
additional toll card issued. These deposits will be returned to Contractor
following the termination of the lease, provided the E-Z Pass and toll card(s) are
returned to Carrier. Carrier will charge Contractor for any toll violations incurred
by Contractor.

13. <u>Insurance:</u>  Carrier will provide primary insurance for the protection of the public pursuant to
USDOT regulations presently found under 49 U.S.C. 13906. Non-Trucking "Bobtail"
insurance must be provided by Contractor in the amount of $1,000,000 per occurrence and
Carrier will be provided with a suitable certificate of insurance naming Carrier as additional
insured. If Contractor desires to purchase insurance through Carrier's insurance agent,
Contractor will so signify by signing Appendix C of this Agreement and will authorize a
deduction from compensation in the amount shown thereon. Carrier will provide Contractor
with a copy of any policy for which a deduction is agreed to upon request.

14. <u>Worker's Compensation/Occupational Accident Insurance:</u>

    a.   <u>Insurance</u>.  During the term of this Agreement, Contractor shall, at Contractor's
expense, carry and maintain in full force and effect either worker's compensation

9

JBHI000336

and other employer's liability insurance as required by applicable law covering all persons employed by Contractor, or a substitute policy acceptable to Carrier if Contractor is a sole proprietor, such as occupational accident insurance providing similar coverage and benefits, in connection with the performance of freight transportation services hereunder as will fully protect Contractor from any and all claims under applicable law.

b.      Certificate of Insurance.  All such insurance policies required under Paragraph 14(a) above shall be non-cancellable and non-amendable without at least thirty (30) days prior written notice to Carrier.  Such insurance may be furnished under any blanket policy carried by Contractor or under a separate policy therefor. Contractor shall furnish to Carrier the most current certificates of insurance for such policies.  Carrier shall be named as an additional insured on Contractor's policy.  Contractor acknowledges that its worker's compensation or occupational accident insurance shall be its sole source of recovery and that no claim to Carrier's own worker's compensation policy exists at any time during the term of this contract.

c.      Purchase of Policy through Carrier.  In the event Contractor purchases the worker's compensation and/or occupational accident insurance above, through the Carrier for the Contractor's convenience, Contractor shall pay the premiums therefor in advance to Carrier.  Such premiums shall be refundable only to the extent allowed under the terms and conditions of the insurance policy.  If Contractor fails to pay Carrier the premium for such policy when due, Carrier shall make the necessary set-offs and deductions pursuant to paragraph 22-23 below. Carrier shall furnish to Contractor the most current certificates of insurance for all such policies purchased through Carrier, and Carrier shall otherwise comply with the requirements of 49 C.F.R. §376.12(j)(2) or any successor regulations.

10

JBHI000337

d.  <u>Disclaimer</u>.  With respect to the insurance policy purchased through the Carrier for the Contractor's convenience pursuant to Paragraph (c) above, Contractor understands and agrees that Carrier is not an agent of nay insurance company that may issue such insurance coverage.  CONTRACTOR UNDERSTANDS AND AGREES THAT CARRIER DOES NOT MAKE ANY REPRESENTATION THAT ANY INSURANCE OFFERED TO CONTRACTOR BY CARRIER IS ADEQUATE TO COVER CONTRACTOR'S EXPOSURES.  Under no circumstances shall Contractor attempt to hold Carrier responsible for any failure on the part of any insurance company to honor the terms and conditions of any policy Contractor may purchase through Carrier.

15.  <u>Purchase of Items from Carrier:</u>  Contractor is not required to purchase or rent any products, equipment, or services from Carrier as a condition of this Agreement.  <u>Any product, equipment, or service which Contractor elects to purchase or rent from Carrier shall be set forth with specificity in this Agreement and Appendix B and C hereto.</u>

16.  <u>Shortage, Loss or Damage to Cargo:</u>  Contractor will be responsible for the loading and unloading of freight under this Agreement, and shall be compensated in the event of hand loading or unloading in accordance with Appendix B. Contractor is responsible for making sure the freight is properly counted and is in apparently good condition when loaded and is responsible for viewing the freight when being unloaded.  If there is any loss, shortage or damage of the freight when in Contractor's possession, Contractor shall indemnify Carrier as specified in Paragraph 20 of this Agreement.  In the event of any such claim, Carrier will deliver to Contractor a written explanation and itemization of any deductions for cargo or property damage made from Contractor's compensation prior to taking such deduction from Contractor's compensation.

17.  <u>Trailers:</u>  In the event either Carrier or a customer provides a trailer for the use of Contractor in providing its transportation services, Contractor shall inspect the trailer for prior damage and

11

road worthiness. If Contractor notices any damage to the trailer or road unworthiness, Contractor shall immediately notify Carrier. Contractor shall not commence operation until the problem has been repaired. Any physical damage to the trailer while in the possession of Contractor will be assessed to Contractor if no notification has been presented to Carrier, except as provided under Paragraph 18 of this Agreement. The parties acknowledge CDL drivers are required to inspect all equipment including trailers before commencing transportation. Upon notification, Carrier will cause repairs to the trailer to be made as soon as possible.

18. <u>Fines, Penalties, Court Costs:</u> Contractor will reimburse Carrier for the actual cost to Carrier of all fines, penalties and reasonable attorney fees and costs resulting from Contractor's improper operation of the Equipment. Contractor will notify Carrier if it has an overweight load so that corrective action may be taken. Except when the violation results from the acts or omissions of Contractor, Carrier shall assume the risks and costs of fines for overweight and oversized trailers when the trailers are preloaded, sealed, or the load is containerized, or when the trailer or lading is otherwise outside of Contractor's control and for improperly permitted over-dimension and overweight loads and shall reimburse the Contractor for any fines paid by Contractor. Contractor shall assume responsibility for inspecting and weighing all loads prior to departure to ensure that the trailers are loaded and otherwise in accordance with all applicable law and regulations. Any penalties or fines resulting from Contractor's failure to undertake such responsibilities promptly and properly or failure to take appropriate action to bring the loads and trailers in compliance with all applicable law and regulations, including fines and penalties for overweight trailers shall be deemed to be the obligation of Contractor, if such action is within the control of Contractor.

19. <u>Administrative Costs:</u> Contractor agrees to pay to Carrier a fee of $50.00 per year to compensate Carrier for the cost of qualifying contractor's drivers under US DOT regulations as set forth in paragraph 10 of the lease. Further, Contractor agrees to bear the costs associated

12

JBHI000339

with monies advanced to Contractor in accordance with paragraphs 22 and 23 of this Agreement.

20. <u>Indemnification:</u>   Contractor agrees to indemnify, defend, save and hold harmless Carrier from any and all claims, fines, or other expenses (including reasonable attorney fees) imposed by reason of Contractor's (or Contractor's employee's or driver's) wrongful actions, wrongful omissions, negligence, or wrongful violation of the terms of this Agreement, when such expenses are based upon the following: damage to property; any violation by Contractor of USDOT regulations or those regulations of any state or local authority; the loss, shortage, or damage to cargo while in Contractor's possession; the damage to owned trailers while in the Contractor's possession.  When any claim, fine, or other expense for which Contractor must indemnify Carrier is covered by Carrier's insurance, Contractor will only have to indemnify Carrier for the amount of the insurance deductible that Carrier actually pays for such covered expense, minus any related insurance proceeds due Carrier.  The provisions of this paragraph are subject to the exceptions contained in Paragraph 18 above.  This indemnification shall apply to the first <u>$500.00</u> of any cargo loss and to the first <u>$1,500</u> per occurrence for property damage and personal injury resulting from preventable accidents.

21. <u>On-Board Communications:</u>  A portion of the cost of establishing and maintaining on-board communications between Carrier dispatch and the leased unit shall be borne by the Contractor. Carrier's customers require each owned or leased tractor to carry compatible on-board equipment which Contractor, at its option, may purchase, install and maintain.  If Contractor elects to rent such equipment from Carrier, Contractor will reimburse Carrier in accordance with paragraph 23.  Carrier's duties and obligations with respect to on- board communication devices are set forth in Appendix E.

22. <u>Charge-Back Items:</u>  Carrier may, at its option, advance monies directly to Contractor for the benefit of Contractor, including advances for single state registration, fuel, fuel advances, cash advances, and repair costs. Contractor hereby agrees that Carrier may deduct from

13

JBHI000340

Contractor's compensation the costs of fuel advances, cash advances, and cash advance charges and items which Contractor elects to purchase or rent from Carrier pursuant to paragraph 15. Contractor further agrees that Carrier may deduct from Contractor's compensation for shortage, loss and damage to cargo that Contractor is responsible for under Paragraph 16, for damage to trailers that Contractor is responsible for under Paragraph 17, for re-powering and abandoned trailer recovery costs that Contractor is responsible for under Paragraph 12, for indemnification in accordance with paragraph 20, and for insurance charges that Contractor is responsible for under Appendix C. Contractor further authorizes Carrier to deduct whatever amount is required by law in the event of a garnishment or attachment. Carrier is authorized to deduct for any federal, state or provincial taxes, fines, or benefits that Carrier is required to pay as a result of Contractor's failure to comply with the terms of this Agreement. Carrier is authorized to deduct the replacement cost of any equipment issued by it to Contractor which is lost or destroyed and the repair cost for damaged items. Other miscellaneous charge-back items and the amount of authorized deductions are set forth in Appendix B. The computations of the above deductions are stated in Paragraph 23 below.

23. <u>Computation of Deductions/Copies:</u>    All deductions from Contractor's compensation shall be equal to the exact net amount paid by Carrier and charged by the provider of the item charged, minus any related rebates, discounts, or refunds due Carrier. The computation of deductions will be made as follows:

      a.   <u>Cash Advances Requested by Contractor.</u>    Carrier pays a fee for each transaction requested by Contractor (or its driver). The amount to be deducted from Contractor's compensation for each advance will be the amount of the advance plus the provider's transaction charge, which is currently <u>$1.20</u> plus an <u>$8.80</u> administrative charge. Should the transaction provider alter its fee, Carrier shall provide Contractor written notice of the amount of the new charge before such new amount is deducted from Contractor's compensation.

14

b.   Driver Qualifications/Related Administrative Costs.  Carrier will deduct from Contractor's compensation the exact net amount paid by Carrier and charged by the provider(s) of driver qualification services, less any related rebates, discounts, or refunds due Carrier.  Carrier will also deduct 15% of such net amount as an administrative fee.  Such driver qualification services and fees are as follows:

No driver qualification fees will be charged under this agreement.

c.   Insurance.   The amount of any insurance premium to be charged back to Contractor shall be shown on Appendix C.

d.   On-board Communications.  The charge to Contractor for onboard communications which is installed and maintained by Carrier shall be $25.00 per month for a 3-piece unit and $50.00 per month for a 2-piece unit, deducted from Contractor's weekly settlement.

e.   Fines/Penalties/Court Costs.   The amount of chargeback for costs and expenses to Carrier within the limitations of Paragraphs 18 and 20 of this Agreement shall be the exact net amount paid by Carrier and imposed by the charging authority, minus any related rebates, discounts, or refunds due Carrier. The amount of reasonable attorney fees and costs due Carrier under Paragraphs 18 and 20 shall be equal to the actual fees and costs paid by Carrier in connection with the particular court proceeding.

f.   Shortage, Loss and Damage.   The amount for shortage, loss or damage to freight that Contractor must pay to Carrier pursuant to Paragraph 20 of this Agreement shall be equal to the exact net amount paid by Carrier, minus any related rebates, discounts, or refunds due Carrier and subject to the per occurrence limitations set forth above.  When any claim, fine, or other expense for which Contractor must indemnify Carrier under Paragraph 20 is covered by Carrier's

15

JBHI000342

insurance, Contractor will only have to pay to Carrier the actual cost to Carrier for such covered expense, minus any related insurance proceeds due Carrier. The amount of reasonable attorney fees and costs due Carrier under Paragraph 20 shall be equal to the actual fees and costs paid by Carrier in connection with the particular court proceeding. Contractor's maximum liability is $500 per incident.

g.      Repowering/Recovery of Trailers.  The repowering charge will be computed by the actual amount paid to driver/contractor to reposition its equipment and deliver the freight to the customer pursuant to Paragraph 12(d) of this Agreement.  The abandoned trailer recovery charge pursuant to Paragraph 12(e) of this Agreement will be computed by actual cost to Carrier to recover the abandoned trailer.

h.      Base Plates and Single State Registration.  Carrier shall pay the costs associated with base plates and compliance with single state registration.

i.      Other Charge-Back Items.  For any additional charge-back items specifically authorized under the terms of this lease, but not specifically enumerated in this paragraph, the computation of the deduction and the calculation method of said deduction will be the exact net amount paid by Carrier and charged by the provider of the item charged, minus any related rebates, discounts, or refunds due Carrier.  Carrier may make deductions for operating taxes on an accrual basis.

j.      Copies.  Upon request, Carrier will provide Contractor with all documentation supporting the validity of the charge-back items under the terms of this Agreement, and the validity of all deductions taken from Contractor's compensation.

k.      Equipment Purchase Agreement.  If Contractor has elected to acquire ownership of the subject equipment through a lease purchase agreement with

16

JBHI000343

Carrier or its affiliate or through a sublease guaranteed in whole or in part by Carrier, the terms and conditions of that agreement will be attached as Appendix F and incorporated by reference. *Note: Additional chargeback items may be set forth in Appendix B if applicable.*

24. <u>Escrow Funds:</u> Carrier may require an escrow fund under the following terms:

a.    <u>Amount</u>. The minimum amount of the escrow fund or performance bond which Carrier may require from Contractor is <u>$1,500.</u>

b.    <u>Specific Items</u>. The specific items for which Carrier may deduct from the escrow fund under the terms of this lease are those items specified in the <u>Chargeback</u> and <u>Computation of Deductions</u> Paragraphs and Appendix B and C of this lease. The failure of Carrier to take monies from such fund for the benefit of Contractor will not be waived by Carrier if Carrier does not deduct those amounts from previous settlements.

c.    <u>HVUT Set-Off</u>. Notwithstanding Contractor's obligation to pay the Federal Highway Vehicle Use Tax as required under Paragraph 12(h) above, Contractor and Carrier hereby agree that Carrier shall file and submit payment on behalf of Contractor for such tax. In order to submit payment for the Federal Heavy Vehicle Use Tax, Carrier shall set-off additional amounts from IC Compensation as set forth in the Compensation and Fee Schedule over a period of time leading up to the filing date as may be necessary until the required amount to pay such tax has been accumulated and deposited in the Escrow Funds.

d.    <u>Right to Replenish Funds</u>. In the event Escrow Funds are reduced below the required balance as a result of deductions made therefrom pursuant to the terms of this agreement, Carrier shall have the right to replenish the Escrow Funds by setting off amounts from compensation due Contractor over a period of time as

17

may be necessary to reach again the required balance at the rate of $50.00 per week.

e.    Accountings.  While the escrow fund is under the control of Carrier, Carrier shall provide an accounting to the Contractor of any transaction involving the escrow fund by clearly indicating in individual settlement sheets the amount and description of any deduction or addition made to the escrow fund. Furthermore, the Contractor has the right to demand at any time an accounting of any transactions involving the escrow fund.

f.    Interest.  While the escrow fund is under the control of Carrier, Carrier shall pay interest on the escrow fund on at least a quarterly basis.  For purposes of calculating the balance of the escrow fund on which interest must be paid, Carrier will deduct a sum equal to the average advance made to the Contractor during the period of time for which interest is paid.  The interest rate shall be established on the date the interest period begins and shall be at least equal to the average yield or equivalent coupon issue yield on 91 day, 13-week Treasury bills as established by the Department of Treasury at the beginning of the quarter.

g.    Return of Escrow Fund.  At the time of the return of the escrow fund, Carrier may deduct monies for those obligations incurred by the Contractor which have been previously specified in this lease, and Carrier shall provide a final accounting to the Contractor for all such final deductions made to the escrow fund. In no event shall the escrow fund be returned later than 45 days from the date of termination of this lease.

h.    Excess Funding.  Contractor at its election may deposit funds above the required escrow minimum with Carrier for Contractor's unrestricted use.  Carrier will fully comply with Section (a) through (e) with respect to such funds reserving its full rights of deduction.

18

JBHI000345

25. <u>Identification of Equipment and Return of Identification Upon Termination:</u>  During the period of the lease, and while the equipment is being operated on behalf of Carrier, the equipment shall be identified in accordance with all applicable federal regulations.  Contractor agrees that upon termination of this Agreement, Contractor will promptly return all placards and will no longer operate its equipment under Carrier's authority from the USDOT or other state agencies.  If Carrier's identification numbers are "painted," Contractor will warrant or exhibit to Carrier or its agent that the painted numbers have been removed from the equipment. Contractor warrants it will not perform motor carrier service under Carrier's USDOT operating authority or have Carrier's USDOT numbers or state numbers on the equipment as working for Carrier while not dispatched by Carrier.  Upon termination of the lease, Carrier may withhold final payment to Contractor until Contractor either returns the above-referenced identification devices, or sends a letter to Carrier certifying that such devices have been lost or stolen.  If Contractor does not provide Carrier with a receipt for the equipment upon termination and either return the above-described identification devices or offer evidence that painted signage has been removed, Carrier shall have the right to immediate possession of the equipment to secure removal of signage and Contractor shall bear all reasonable cost, including attorney's fees to accomplish this result.

26. <u>Surrender of Possession at Termination:</u>  In the event of breach or default by Contractor of its obligation to surrender possession of any trailer, base plate, or equipment as reflected in Appendix B, Contractor shall be liable to Carrier for all expenses and damages including, but not limited to, attorney's fees, court costs and loss of use, incurred by Carrier in reacquiring possession.  In the event Contractor retains custody of property of Carrier or otherwise fails or refuses to deliver possession thereof to Carrier, upon demand or upon termination of this Agreement, in addition to any other remedies available to Carrier, Contractor shall be liable to Carrier in the amount of Fifty Dollars ($50.00) for each day or portion thereof that the item is

19

JBHI000346

not returned to the actual or constructive possession of the carrier, not as a penalty, but as liquidated damages to cover the cost to Carrier of the loss of use.

27. Condition Upon Surrender of Possession:  Contractor agrees it will surrender possession of items to Carrier in as good a condition as they were when Contractor received them, normal wear and tear from use excepted.

28. Effect of Termination:  Upon termination of this Agreement as to any or all tractors leased hereunder:

a.    Contractor shall do all of the following:  (A) submit to Carrier all necessary delivery documents and other paperwork showing full and proper performance of all trips, (B) all identification, permits, plates and decals of Carrier on each tractor shall have been removed by Contractor and returned to Carrier in accordance with the provisions of paragraph 26 above, or if such identification, permits, plates and decals have been lost or stolen, Contractor shall have given written notice to Carrier certifying that same have been removed from the tractor, (C) any OBC shall have been returned to Carrier in accordance with the provisions of paragraph 21 above, (D) all E-Z Pass and toll cards have been returned to Carrier and (E) any other Carrier-issued equipment utilized by Contractor shall have been returned to Carrier in accordance with the provisions of paragraph 12 above.

b.    Notwithstanding anything contained in paragraph 28(a) above to the contrary, and without affecting Carrier's rights under paragraph 20 above, the final IC compensation settlement, and funds on deposit in the Escrow Funds, shall be paid and disbursed to Contractor within forty-five (45) days of termination. Carrier shall provide Contractor with an accounting of all such final settlements and disbursements, and any set-offs and deductions thereto, as to any or all tractors so terminated.

20

JBHI000347

██████████████

c.     Neither party hereto shall, by reason of the termination of this Agreement as to any or all tractors leased hereunder or otherwise, be liable to the other for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated revenues or on account of any expenditures, investments or commitments made in connection with the business or goodwill of Contractor or Carrier or for any other loss arising by reason of the termination hereof.  Any effect of termination on Contractor's rights with respect to any lease/purchase options concerning involved equipment will be set forth in Appendix C.

29.  Assignment:  This Agreement is not assignable by either party without the written consent of both parties.

30.  Entire Agreement:  This Agreement, and Appendices A-E, constitute the entire agreement and understanding between the parties and shall not be modified, altered or changed without the express written consent of both parties.

31.  Waiver:  No waiver by Contractor or Carrier of any provision of this Agreement shall be deemed to be a waiver of any other provision hereof.

32.  Multiple Copies:  This Agreement is made in multiple copies.  Contractor shall keep one (1) copy for himself or herself, and keep one (1) copy in the equipment at all times while operating under dispatch for Carrier.

33.  Jurisdiction and Venue:  This Agreement is executed in Arkansas and any legal proceeding, whether state or federal, involving this Agreement shall be brought in the State of Arkansas.

| J.B. HUNT TRANSPORT, INC. | INDEPENDENT CONTRACTOR |
|---|---|
| Signature: _Donald Y. Ingersoll_ | Signature: _____ |
| Printed Name: Don Ingersoll | Printed Name: Girik Issaian |
| Title: Vice President of Operations | Date: 08/05/11 |

21

JBHI000348

**J.B. Hunt Transport, Inc.**
Intermodal Addendum To The
**Intermodal Independent Contractor Operating Agreement**

THIS ADDENDUM is made to the Independent Contractor Operating Agreement ("IC Agreement"), dated ___08/05/11___ between J.B. Hunt Transport, Inc. ("Carrier") and ___Girik Issaian___ ("Contractor"). The terms of this Addendum shall be effective upon the ___08-05___, 20 _11_.

**WHEREAS,** Contractor has agreed to provide transportation services for Carrier as an independent contractor; and,

**WHEREAS,** Carrier and Contractor have agreed that such services are to be rendered strictly at one or more of Carrier's Intermodal **Locations**.

**NOW, THEREFORE,** Contractor and Carrier agree that the following terms and conditions are hereby added to the IC Agreement:

1. Addendum:

    a. Appendix A - Any specific customer service expectations with which Carrier is bound to comply at any Intermodal locations shall be attached as an Appendix A to this Addendum. As Contractor may be required to perform services at one or more Intermodal locations each Appendix A shall name the location to which it applies. Contractor shall comply with these customer services requirements in providing services to Carrier.

    b. Appendix B - The original IC Compensation table from Appendix B of the IC Agreement shall be superceded by project-specific IC Compensation Tables, copies of which shall be negotiated and attached to the Addendum as one or more Appendices B. Project-specific IC Compensation Tables are necessary since Intermodal negotiates varied rates of payment with each Intermodal customer. Therefore, each IC Compensation table will need to be negotiated separately to ensure that payment to Contractor falls within the parameters of Intermodal pricing models for each separate **location**.

2. All other terms and conditions of the IC Agreement remain unchanged hereby.

**J.B. HUNT TRANSPORT, INC.**

Signature: _Donald J. Ingersoll_

Printed Name: _Don Ingersoll_

Title: _Vice President of Operations_

**INDEPENDENT CONTRACTOR**

Signature: _____

Printed Name: _Girik Issaian_

Date: _08/05/11_

22

SS#

## J.B. Hunt Transport, Inc.
### Intermodal Independent Contractor Operating Agreement

#### Appendix C:  Insurance Appendix

This Appendix relates to the Owner/Operator Contract and Lease Agreement between J.B. HUNT TRANSPORT, INC. ("Carrier") and the Contractor named below:

Contractor is not required to purchase insurance from or through Carrier.  In fact, Carrier desires Contractor to purchase insurance on its own and to provide certificates of insurance pursuant to the Agreement.  If Contractor, at its option, desires to purchase any insurance through Carrier's independent agent, this Appendix must be signed by Contractor and Carrier.

Contractor desires to purchase the following insurance through Carrier's independent insurance agent and have Carrier advance the cost for the same.  Contractor hereby authorizes Carrier to deduct from compensation otherwise owed to Contractor for this insurance.  The calculation for the following insurance costs to the Contractor will be the exact net amount of the premium paid by the Carrier and charged by the insurer for that coverage, less any related rebates, discounts, or refunds due Carrier.

    a.    <u>Bobtail Insurance:</u>  Contractor hereby agrees to pay $ _18.00_
per month for Bobtail Insurance.
Initial if Yes  _GI_
Initial if No  _____

    b.    <u>Physical Damage:</u>  Contractor hereby agrees to pay $ _26.92_
per month for Physical Damage Insurance.
Initial if Yes  _GI_
Initial if No  _____

    c.    <u>Occupational Accident:</u>  Contractor hereby agrees to pay
$ _148.28_ per month for Occupational Accident Insurance.
Initial if Yes  _GI_
Initial if No  _____

Carrier will provide a copy of any such policy upon the request of Contractor.  Carrier will provide a certificate of insurance for each such policy, including the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage.  Contractor hereby authorizes Carrier to deduct from its compensation the amounts specified above.

**J.B. HUNT TRANSPORT, INC.**        **INDEPENDENT CONTRACTOR**

Signature: _Donald Ingersoll_        Signature: _____

Printed Name: <u>Don Ingersoll</u>        Printed Name: _Girik Issaias_

Title: <u>Vice President of Operations</u>        Date: _08/05/11_

23

SS#

## J.B. Hunt Transport, Inc.
### Intermodal Independent Contractor Operating Agreement

#### Appendix D: General Savings Fund Authorization

Independent Contractor hereby authorizes to deduct, to the extent available, amounts from IC Compensation otherwise due Independent Contractor with respect to the tractor specified below in the manner set forth below and to deposit such amounts into the General Fund:

Tractor Number: __381720__

Effective Date: __8-5-11__

Deduction Amount:

      Cents Per Paid Mile Per Week      $ __0.02__

This General Savings Fund Authorization is entered into in connection with an Independent Contractor Agreement executed by Independent Contractor and J.B. Hunt Transport, Inc. The maximum balance in the General Savings Fund at any time will be limited to $10,000.

**Independent Contractor**

_____
(Signature)

__Girik Issaian__
(Typed or Printed Name)

__08/05/11__
(Date)

24

SS# ███████████

## J.B. Hunt Transport, Inc.
### Intermodal Independent Contractor Operating Agreement

#### Appendix E:  On-Board Computer (OBC) Operations

1. <u>Non-Use While in Motion</u>: Contractor hereby represents to Carrier that the OBC will not be used while tractor is in motion. If, and only if, a tractor is being operated by a team, then the non-driver may use the OBC while the tractor is in motion.

2. <u>Maintenance</u>: Contractor shall protect the OBC from damage and abuse so as to keep the OBC in good repair, condition and working order during the term of this agreement, normal wear and tear excepted. Carrier will at its own cost and expense, repair or replace a damaged or defective OBC. Contractor shall promptly notify Carrier of any problems associated with the OBC.

3. <u>Risk of Loss</u>: Contractor shall bear the entire risk of loss, damage or destruction of the OBC resulting from any theft, fire, accident or other casualty whatsoever. Contractor shall promptly notify Carrier of any such loss. Contractor shall pay Carrier the amount as set forth in the compensation and fee schedule for any such loss.

4. <u>OBC Return</u>: Upon termination of this Agreement for any reason:

   (a) Contractor shall deliver the tractor to such point as requested by Carrier for removal of the OBC. Contractor shall return OBC in the same condition as when received, normal wear and tear excepted.
   (b) In the event Contractor fails to return the OBC within (3) days of termination, Contractor agrees to pay Carrier the liquidated damages as set forth in Appendix B of the Agreement. Carrier reserves the right to deduct such amount from Contractor's escrow funds as necessary to satisfy this obligation.
   (c) In the event Contractor fails to return the OBC as requested, Carrier shall be entitled to receive the costs and expenses (including reasonable attorneys' fees) incurred by Carrier in recovering such OBC. Carrier shall make the necessary set-offs and deductions as required.

Date OBC Received by Independent Contractor: ___08/05___ ,20_11_.

Type of Unit Installed:_____(2 Piece)   _X_ (3 Piece).

Acknowledgement of Receipt of OBC: _____ *Girik Issaian*
                                            (Contractor Signature)

                                    _____ *Girik Issaian*
                                            (Typed or Printed Name)

25

JBHI000352



## J.B. Hunt Transport, Inc.
### Intermodal Independent Contractor Operating Agreement

### Appendix A:  Service Requirements

To the Intermodal Addendum to the Independent Contractor Operating Agreement.  This Appendix A applies to services render at the Intermodal location of **South Gate, CA** and shall be effective the  8/5 , 20 11 .

In addition to any service expectations set out in the IC Agreement, listed below are customer service expectations that Contractor shall meet in servicing Carrier's transportation needs at the above-named Intermodal location.

I. Service Standards

Contractor shall comply with any additional service standards as set out in Article VI of the transportation agreement between Carrier's Intermodal group and the Intermodal customer. That agreement states:

1.  Carrier shall transport such shipments as Shipper may require by motor vehicle from and to such points between which service may be required, without delay, subject to the availability of suitable equipment for the traffic offered and the specific shipment instructions, all in accordance with the terms and conditions of this Contract and Appendices.

2.  Carrier will accept tender of shipments as directed by Shipper and transport and deliver such shipments promptly and efficiently. Carrier shall perform loading and unloading services as required by Shipper and agreed to by Carrier. Each shipment shall be evidenced by a bill of lading or other receipt. Such bill of lading or receipt is to be signed by Carrier and will show the kind, condition and quantity of commodities received and delivered by Carrier at the loading and unloading points.

3.  Carrier understands and agrees in performing services under this Contract that time is of the essence in the pickup, transportation and delivery of individual shipments and that it agrees to meet all prearranged pickup and delivery times."

*On Time Service Percentage*

**Business which is handled by J.B. Hunt Transport, Inc. Intermodal group shall provide 98% on-time performance.  Drivers will be put on probation after two service failures within a quarter. The third service failure during the next six month period immediately following the second service failure will result in the termination of the contract.**

**All Service Failures will be measured and reported with proper reason codes.  Service Failures resulting from driver error or mechanical will be classified as JB Hunt failures, which affect the contracted service percentage.  Failures resulting from shipper or receiver delays, railroad, dispatch error, weather, abnormal traffic flow, and/or other Acts of God, will be measured but not included in the contracted service percentage.**

Initials: _____     Initials: _____

For:     J.B. Hunt Transport, Inc.     For:     Independent Contractor

### J.B. Hunt Transport, Inc.
#### Intermodal Independent Contractor Operating Agreement

**Appendix A:  Service Requirements**

II. Provision of Proof of Delivery

Contractor shall provide Carrier with copies of signed bills of lading and signed delivery receipts as evidence of the complete performance of such services.

III. Refused and Rejected Shipments

In order to comply with the Intermodal customer requirements set out under Article XI(2) Contractor shall adhere to the following procedures. When a shipment is refused or rejected by the consignee, or Contractor is unable to deliver it for any reason, Contractor shall notify Carrier in order to receive disposition instructions Contractor shall provide constant and sufficient security and safety for the shipment until such disposition instructions are received.

IV.    Confidentiality

Contractor hereby agrees, to the extent he becomes aware of any terms of the relationship between Carrier and the Customer, to be bound to the terms of confidentiality to which Carrier is bound.  They are:

> "Without the express written consent of the other party, no party shall disclose the terms of this Contract or Appendices to any third party, except (a) as required by law or regulation, (b) to an authorized audit agency designated by a party for audit purposes or (c) to an affiliate or potential affiliate of a party."

*V.    The following are additional factors affecting service derived from customer requirements and expectations established in the Intermodal transportation agreement:*

*Primary Traffic Lanes or areas of Service: Within a 125 mile radius of South Gate, CA*

*Supervisory Hours of Operation:  24 hours a day/7 days a week*

*Supervisory Responsibility for non-dedicated deliveries:  24 hours a day/7 days a week.*

*Loading Hours:  24 hours a day 7 days a week.*

*Operating Days per year:  365 days*

*Delivery Hours:  24 hours a day/7 days a week*

| Initials: | _____ | Initials: | _____ |
|-----------|---------------|-----------|---------------|
| For: | J.B. Hunt Transport, Inc. | For: | Independent Contractor |

2

JBHI000354



### J.B. Hunt Transport, Inc.
#### Intermodal Independent Contractor Operating Agreement

#### Appendix B: Compensation and Fees

To the Intermodal Addendum to the Independent Contractor Operating Agreement. This Appendix B applies to services render at the Intermodal location of **South Gate, CA** and shall be effective _____, 20____.

| | |
|---|---|
| Linehaul-Loaded (Per Mile) | $0.85 |
| Linehaul-Empty (Per Mile) | $0.85 |
| Pick-up / Delivery (Drop/Hook) | $45 |
| Pick-up / Delivery (Live) | $65 |
| Otay Mesa, CA Border Repowering of Load | $45 |
| Empty Trailer Reposition | $30 |
| Hazmat Load | $10 |
| Customer Refused Load | $65 |
| Truck Ordered Not Used (TONU) | $30 |
| Safety Training | $30/Hour |
| Driver Orientation (Per Truck) (After 4 days holdover rate is $50/day) | $75/Day |
| Fuel Surcharge (Revised 2-18-03) | Surcharge Schedule |
| Tolls | Carrier Paid |
| Base Plates | Carrier Paid |
| Permits | Carrier Paid |
| Scales | Reimbursed |

Initials: _____        Initials: _____

For:    **J.B. Hunt Transport, Inc.**        For:    **Independent Contractor**



## J.B. Hunt Transport, Inc.
### Intermodal Independent Contractor Operating Agreement

### Appendix B:  Compensation and Fees

### Fees, Charges, Balances and Other Amounts

Pursuant to the applicable provisions of the Independent Contractor Agreement, Independent Contractor shall be liable for the fees, charges, balances and other amounts as set forth in the table below, including, but not limited to the following:

| Nature of Fee/Amount | Fee/Amount |
| --- | --- |
| Truck Lease/Purchase Payment | NA |
| Independent Contractor-Initiated Re-Power: Minimum Charge | $50 |
| Non-trucking Liability Insurance (Single Limit) | $1,000,000 |
| Preventable Loss: Personal Injury/Property Damage | $1,500 |
| Preventable Loss: Cargo Shortage/Damage | $500 |
| Escrow Funds: Required Balance | $1,500 |
| Escrow Funds: Minimum Weekly Set-Off for Required Balance | $50 |
| Escrow Funds: Minimum  HVUT  (2290) Set-Off | $550/Year |
| Annual Administrative Fee | No Charge |
| Fuel Use/Tax  Reserve (per Carrier Directed Mile) | $0.01 |
| Miscellaneous Equipment Issued to Independent Contractor | Equipment Value |
| OBC Monthly Usage Charge | $25 |
| OBC  Replacement Value | $2,000 |
| OBC Daily Liquidated Damages (Improper Turn-In) | $50 |
| OBC Maximum Liquidated Damages (Improper Turn-In) | $2,000 |
| Failure to Return Decals/Permits/Plates: Daily Liquidated Damages | $50 |
| Road Service Fee  (Tractor Maintenance) | $20/Event |
| Annual Motor Carrier Property Tax (AR, KS, KY, TN) | $55/Year |

Initials:  _L m_
For:  **J.B. Hunt Transport, Inc.**

Initials:  _GJ_
For:  **Independent Contractor**

JBHI000356

### J.B. Hunt Transport, Inc.
**Intermodal Independent Contractor Operating Agreement**

**Appendix B:  Compensation and Fees**

**Miscellaneous**

    A.  Carrier's Right to Modify or Terminate

    Independent Contractor specifically understands and agrees that Carrier, in its sole discretion, shall have the right to modify or terminate from time to time the compensation rates as set forth in Part I of this Schedule and the fees and related amounts set forth in Part II of this Schedule. Carrier shall give Independent Contractor not less than thirty (30) days written notice prior to the effective date of any such change with the exception of the fuel surcharge payment which will vary at the discretion of the Carrier. The terms of this document supercede any previously executed agreement.

| Initials: | _____ / m _____ | Initials: | _____ G̶T̶ _____ |
|-----------|------------------------|-----------|------------------------|
| For:      | J.B. Hunt Transport, Inc. | For:   | Independent Contractor |

5

JBHI000357



## J.B. Hunt Transport, Inc.
### Intermodal Independent Contractor Operating Agreement

#### Appendix B:  Compensation and Fees

**Detention Schedule**

Contractor will be eligible for compensation (detention) in the event that he/she is detained longer than 1.5 hours at a customer.  Contractor will be paid following his arrival or customer appointment time, whichever comes last.  Contractor becomes ineligible if JBHT is unable to charge the customer detention *due to a driver related service failure*.  After 1.5 hours of detention, pay is $30.00 per hour excluding any time the driver is legally required to be off duty or taking a 10 hour break.   All detention pay will be paid in 15 minute increments and administered as follows:

| Detention Minutes Incurred | Detention Hours Paid |
| --- | --- |
| 0-7 minutes | 0 hours |
| 8-22 minutes | ¼ hour the hourly rate |
| 23-37 minutes | ½ hour the hourly rate |
| 38-52 minutes | ¾ hour the hourly rate |
| 53-60 minutes | 1 hour |

Initials: _____     Initials: _____
For:    J.B. Hunt Transport, Inc.     For:    Independent Contractor

**J.B. Hunt Transport, Inc.**
**Intermodal Independent Contractor Operating Agreement**

**Appendix B:  Compensation and Fees**

**South Gate Local Intermodal Independent Contractor Incentive**

As an additional incentive for contractor to accept shipments when tendered and to provide error free service that is needed to meet the needs of carrier's customers as set forth in other addenda hereto, carrier shall pay monthly the additional compensation set forth below.  Such additional compensation is contingent upon:

1 - Contractor accepting all tendered shipments during the month consistent with U.S. DOT safety regulations.

2 - The absence of any service failure caused by contractor.  A disqualifying service failure shall be defined as any instant in which (a) contractor fails to meet customer's performance requirements through a late pick up or delivery caused by something other than late releases, weather, construction/accidents, prior stops, scheduling -- DC, overweight; or acts of God or public enemy; (b) contractor causes a reportable accident which affects carrier's Safestat score or (c) contractor is responsible for an overage, shortage or damage claim.

3 - Contractor must work the equivalent of the total amount of business days in the calendar month excluding holidays.

4 – If the contractor is stopped for a DOT Inspection, the contractor must pass with No Violations Discovered.

***South Gate Intermodal Incentive Compensation Bonus = $300.00***

*Incentive bonus will be paid after the first full pay period of a new month.*

CARRIER:
J.B. Hunt Transport, Inc.

_Donald Ingersoll_
(Signature)

Donald L. Ingersoll
(Printed Name)

Vice President
(Title)

08/02/2011
(Date)

INDEPENDENT CONTRACTOR:

_____
(Signature)

Girik Issaian
(Printed Name)

owner
(Title)

08/05/11
(Date)

Page 7 of 7

JBHI000359



SS#

**J.B. HUNT TRANSPORT, INC.**
Authorized Representative
**J.B.Hunt Transport, Inc.**

### Independent Contractor Operating Agreement

#### Appendix D

#### General Savings Fund Authorization

Independent Contractor hereby authorizes to deduct, to the extent available, amounts from IC Compensation otherwise due Independent Contractor with respect to the tractor specified below in the manner set forth below and to deposit such amounts into the General Fund:

Tractor Number: _3 81 72-C_

Effective Date: _02 - 06 - 13_

Deduction Amount:

      Cents Per Paid Mile Per Week      $ _6 - 25_

This General Savings Fund Authorization is entered into in connection with an Independent Contractor Agreement executed by Independent Contractor and J.B.Hunt Transport, Inc. The maximum balance in the General Savings Fund at any time will be limited to $10,000.

**Independent Contractor**

_[signature]_
(Signature)

_Gregfe Isseaka_
(Typed or Printed Name)

_02 - 06 - 13_
(Date)

Carrier (also referred to as "JBHT") is:

J.B. HUNT TRANSPORT, INC.
615 J. B. Hunt Corporate Drive, PO Box 425
Lowell, Arkansas 72745
Phone: 479-820-0000

2. **Identification of Equipment to be Leased:** Contractor leases to Carrier the motor vehicle or vehicles described as follows:

**Tractor**

Year: _2009_

Make/Model: _FRHT Cascadia_

State Registration: _Indiana_

Vehicle Identification Number: _1FUJGLCK39LAE8674_

3.  **Receipt of Equipment:** The equipment which Contractor will lease to Carrier pursuant to the terms and conditions of this Agreement is identified in the attached Appendix A, which, when executed, will show the date and time of the receipt of the equipment by Carrier. Upon termination of this lease, or when possession by Carrier of the equipment identified in Appendix A ends, Contractor shall give Carrier or its authorized representative a receipt evidencing the date and time of the return of the equipment to Contractor's control.

4.  **Exclusive Use:** Contractor agrees neither it nor its drivers shall have authority to enter into any agreement for the use of the leased equipment covered by this Agreement for the benefit of any person other than Carrier without prior written consent of Carrier.

5.  **Payment to Contractor:** Reference the Intermodal Addendum to the Independent Contractor Operating Agreement Attachment B.

6.  **Time and Conditions of Payment:** Payment to the Contractor shall be made within fifteen (15) days after submission of the necessary delivery documents, logbooks required by the USDOT, and those documents necessary for Carrier to secure payment from the shipper,

JBHI000146

SS# ████████████

## J.B. Hunt Transport, Inc.
### Intermodal Independent Contractor Operating Agreement

#### Appendix C: Insurance Appendix

This Appendix relates to the Owner/Operator Contract and Lease Agreement between J.B. HUNT TRANSPORT, INC. ("Carrier") and the Contractor named below:

Contractor is not required to purchase insurance from or through Carrier. In fact, Carrier desires Contractor to purchase insurance on its own and to provide certificates of insurance pursuant to the Agreement. If Contractor, at its option, desires to purchase any insurance through Carrier's independent agent, this Appendix must be signed by Contractor and Carrier.

Contractor desires to purchase the following insurance through Carrier's independent insurance agent and have Carrier advance the cost for the same. Contractor hereby authorizes Carrier to deduct from compensation otherwise owed to Contractor for this insurance. The calculation for the following insurance costs to the Contractor will be the exact net amount of the premium paid by the Carrier and charged by the insurer for that coverage, less any related rebates, discounts, or refunds due Carrier.

a.  **Bobtail Insurance:**  Contractor hereby agrees to pay $ _18.00_ per month for Bobtail Insurance.
     Initial if Yes _GI_
     Initial if No _____

b.  **Physical Damage:**  Contractor hereby agrees to pay $ _89.38_ per month for Physical Damage Insurance.
     Initial if Yes _GI_
     Initial if No _____

c.  **Occupational Accident:**  Contractor hereby agrees to pay $ _145.00_ per month for Occupational Accident Insurance.
     Initial if Yes _GI_
     Initial if No _____

Carrier will provide a copy of any such policy upon the request of Contractor. Carrier will provide a certificate of insurance for each such policy, including the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage. Contractor hereby authorizes Carrier to deduct from its compensation the amounts specified above.

**J.B. HUNT TRANSPORT, INC.**

Signature: _Donald J. Ingersoll_

Printed Name: _Don Ingersoll_

Title: _Vice President of Operations_

**INDEPENDENT CONTRACTOR**

Signature: _____

Printed Name: _Girik Issaian_

Date: _02-06-13_

JBHI000147

J. B. Hunt Transport, Inc.

**Independent Contractor Operating Agreement**

Appendix A
Certificate of Authorized Operation

1. **Owner Information**
   Name of Owner: _Girik Issaian_

   Address: ████████████████████

2. **Description of Tractor covered by this Agreement**

   Tractor #: _38I720_    (Assigned by Carrier)

   Make: _FRHT_    _Cascadia_

   Year: _2009_    VIN #: _1FUJGLCK39LAE8674_

   Tractor Weight: _18,000_

   Wheel Base: _230_

   Fifth Wheel Height: _47½_

   License #: ████████    State: _Indiana_
   Date/Time/Location Tractor Placed in Service: _02 | 06 | 2013_

   Hub Reading at Time Tractor Placed in Service: _700,180_

3. **Owners Certification:**
   I certify that the information described above is correct to the best of my knowledge.

   _____
   (Signature)

   _Girik Issaian_
   (Typed or Printed Name)

SS# 

### J.B. HUNT TRANSPORT, INC.
Authorized Representative
### J.B.Hunt Transport, Inc.

## Independent Contractor Operating Agreement

### Appendix D

### General Savings Fund Authorization

Independent Contractor hereby authorizes to deduct, to the extent available, amounts from IC Compensation otherwise due Independent Contractor with respect to the tractor specified below in the manner set forth below and to deposit such amounts into the General Fund:

Tractor Number: _381720_

Effective Date: _02-06-13_

Deduction Amount:

   Cents Per Paid Mile Per Week    $ _0.25_

This General Savings Fund Authorization is entered into in connection with an Independent Contractor Agreement executed by Independent Contractor and J.B.Hunt Transport, Inc. The maximum balance in the General Savings Fund at any time will be limited to $10,000.

**Independent Contractor**

_____
(Signature)

_Gin Ye Isscuk_
(Typed or Printed Name)

_02-06-13_
(Date)

JBHI000149

2013-08-01 13:51     Southgate X656          5628066806 >>          JBHunt  P 1/1

SS# ▓▓▓▓▓▓▓

**J.B. HUNT TRANSPORT, INC.**
Authorized Representative
**J.B.Hunt Transport, Inc.**

### Independent Contractor Operating Agreement

**Appendix D**

**General Savings Fund Authorization**

Independent Contractor hereby authorizes to deduct, to the extent available, amounts from IC Compensation otherwise due Independent Contractor with respect to the tractor specified below in the manner set forth below and to deposit such amounts into the General Fund:

Alpha Code: _ISSG7_

Tractor Number: _581726_

Effective Date: _08-01-13_

Deduction Amount: _¢ 20_

Cents Per Paid Mile Per Week          $ _0.20_

This General Savings Fund Authorization is entered into in connection with an Independent Contractor Agreement executed by Independent Contractor and J.B. Hunt Transport, Inc. The maximum balance in the General Savings Fund at any time will be limited to $10,000.

**Independent Contractor**

_(Signature)_

_Girik Essaian_
(Typed or Printed Name)

_08-01-13_
(Date)

JBHI000137

$545

15561



SSN _____

### J.B. Hunt Transport, Inc.
**Intermodal Independent Contractor Operating Agreement**
**Appendix A: Certificate of Authorized Operation and Customer Specifications**

**Contractor Information**

Name:   Girik  Issaica

Address:

**Description of Equipment**

Tractor No.   381720

Make:   frughtLiner

Year:   2009          VIN:

Tractor Weight:   17,000

Wheel Base:

Fifth Wheel Height:

License No.                  State:   IN

Independent Contractor Operating Agreement Start Date:
Hub Reading at Start Date:

**Carrier's Customers' Specifications:**

Contractor agrees to perform services in accordance with customer specifications, identified in this Appendix A, that may be safely complied with without violation applicable law or Carrier's Policies or Procedures, and without endangering the public, Contractor's workers, and the property being transported.

1. Service Standards

    1.    Contractor shall transport such shipments, that Contractor accepts, as Carrier's customer may require by motor vehicle from and to such points between which service may be required, without delay, subject to the availability of suitable equipment for the traffic offered and the specific shipment instructions.

    2.    Contractor agrees to perform loading and unloading services as required by Carrier's customer. Each shipment shall be evidenced by a bill of lading or other receipt. Such bill of lading or receipt is to be signed by Contractor, or Contractor's driver or worker, and will

Page 1 of 6

JBHI000001

show the kind, condition and quantity of commodities received and delivered by Contractor at the loading and unloading points.

3.  Contractor understands and agrees in performing services under the Agreement that time is of the essence in the pickup, transportation and delivery of individual shipments and that it agrees to meet all prearranged pickup and delivery times.

**On-Time Service Percentage**

**Contractor agrees Carrier's customer requires, and Contractor will use best efforts to provide 98% on-time performance.  Carrier's customer may require that Contractor, or Contractor's driver, is disqualified and removed from its account temporarily after two service failures within a quarter, and permanently in the event of a third service failure during the next six-month period.**

**A Service Failure includes incidents of driver error or mechanical error.  A Service Failure does not include shipper or receiver delays, railroad, dispatch error, weather, abnormal traffic flow, and/or other Acts of God.**

II. Provision of Proof of Delivery

Contractor shall provide Carrier with copies of signed bills of lading and signed delivery receipts as evidence of the complete performance of such services.

III. Refused and Rejected Shipments

In the event Contractor attempts to deliver a shipment at the customer's designated delivery location and such shipment is refused or rejected by the consignee, or Contractor is unable to deliver it for any reason, Contractor shall notify Carrier in order to receive disposition instructions from Carrier or Carrier's customer. Contractor shall provide constant and sufficient security and safety for the shipment until such disposition instructions are received.

IV.  Confidentiality

Contractor hereby agrees to the following terms of confidentiality related to the performance of services for Carrier's customer.  They are:

Without the express written consent of the other party, no party shall disclose the terms of Carrier's customer's service specifications and/or shipment information to any third party, except (a) as required by law or regulation, (b) to an authorized audit agency designated by a party for audit purposes or (c) to an affiliate or potential affiliate of a party.

V.  *The following are additional factors related to service performed for Carrier's customer:*

**Primary Traffic Lanes or areas of Service: Within a 125-mile radius of South Gate CA.**
This Appendix A is agreed to by the undersigned parties on the latest date set forth below.

Carrier:  **J.B. Hunt Transport, Inc.**                    Contractor: _Carrik Issaeer_

By: _____                       By: _____
     Signature                                        Signature

Page 2 of 6

JBHI000002

SSN _____ ██████████



**Intermodal**

### J.B. Hunt Transport, Inc.
**Intermodal Independent Contractor Operating Agreement**

#### Appendix B:  Compensation and Fees

This Appendix B to the Intermodal Independent Contractor Operating Agreement applies to services rendered at the Intermodal location of **South Gate, CA** and shall be effective *Feb 25*, 20 *18*.

| (a)  IC Compensation | Intermodal |
|---|---|
| Linehaul-Loaded (Per Mile) | $0.90 |
| Linehaul-Empty (Per Mile) | $0.90 |
| Pick-up / Delivery (Drop/Hook) | $45 |
| Pick-up / Delivery (Live) | $70 |
| Otay Mesa, CA Border Repowering of Load | $45 |
| Empty Trailer Reposition | $30 |
| Hazmat Load | $20 |
| Customer Refused Load | $70 |
| Truck Ordered Not Used (TONU) | $30 |
| Safety Training | $30/Hour |
| Driver Orientation (Per Truck) (After 4 day's holdover rate is $50/day) | $75/Day |
| Fuel Surcharge (Revised 3-29-17) | Surcharge Schedule |
| Tolls | Carrier Paid |
| Base Plates | Carrier Paid |
| Permits | Carrier Paid |
| Scales | Reimbursed |

Initials: _____   Initials: _____

For:   **J.B. Hunt Transport, Inc.**   For:   **Independent Contractor**

Page **3** of 6

SSN: ███████████



### J.B. Hunt Transport, Inc.
#### Intermodal Independent Contractor Operating Agreement

**Appendix B: Compensation and Fees**

#### Fees, Charges, Balances and Other Amounts

Pursuant to the applicable provisions of the Independent Contractor Agreement, Independent Contractor shall be liable for the fees, charges, balances and other amounts as set forth in the table below, including, but not limited to the following:

| Nature of Fee/Amount | Fee/Amount |
|---|---|
| Truck Lease/Purchase Payment | NA |
| Independent Contractor-Initiated Re-Power: Minimum Charge | $50 |
| Non-trucking Liability Insurance (Single Limit) | $1,000,000 |
| Preventable Loss: Personal Injury/Property Damage | $1,500 |
| Preventable Loss: Cargo Shortage/Damage | $500 |
| Escrow Funds: Required Balance | $1,500 |
| Escrow Funds: Minimum Weekly Set-Off for Required Balance | $50 |
| Annual Administrative Fee | No Charge |
| Fuel Use/Tax Reserve (per Carrier Directed Mile) | $0.01 |
| Miscellaneous Equipment Issued to Independent Contractor | Equipment Value |
| OBC Monthly Usage Charge | $25 |
| OBC Replacement Value | $2,000 |
| OBC Daily Liquidated Damages (Improper Turn-In) | $50 |
| OBC Maximum Liquidated Damages (Improper Turn-In) | $2,000 |
| Failure to Return Decals/Permits/Plates: Daily Liquidated Damages | $50 |
| Road Service Fee (Tractor Maintenance) | $20/Event |
| Annual Motor Carrier Property Tax (AR, KS, KY, TN) | $55/Year |

Initials:  _____   Initials:  _____
For:        J.B. Hunt Transport, Inc.                    For:        Independent Contractor

Page 4 of 6

JBHI000004



SSN: ███████████

## Intermodal

**J.B. Hunt Transport, Inc.**
**Intermodal Independent Contractor Operating Agreement**

**Appendix B: Compensation and Fees**

**Miscellaneous**

    A.  Carrier's Right to Modify or Terminate

Independent Contractor specifically understands and agrees that Carrier, in its sole discretion, shall have the right to modify or terminate from time to time the compensation rates as set forth in Part I of this Schedule and the fees and related amounts set forth in Part II of this Schedule. Carrier shall give Independent Contractor not less than thirty (30) days written notice prior to the effective date of any such change with the exception of the fuel surcharge payment which will vary at the discretion of the Carrier. The terms of this document supersede any previously executed agreement.

Initials:
For:    J.B. Hunt Transport, Inc.

Initials:
For:    **Independent Contractor**

Page 5 of 6

JBHI000005

SSN: _____



**J.B. Hunt Transport, Inc.**
**Intermodal Independent Contractor Operating Agreement**

**Appendix B:  Compensation and Fees**

**Detention Schedule**

Contractor will be eligible for compensation (detention) in the event that he/she is detained longer than 1.5 hours at a customer.  Contractor will be paid following his arrival or customer appointment time, whichever comes last.  Contractor becomes ineligible if JBHT is unable to charge the customer detention *due to a driver related service failure.*  After 1.5 hours of detention, pay is $30.00 per hour excluding any time the driver is legally required to be off duty or taking a 10-hour break.   All detention pay will be paid in 15 minute increments and administered as follows:

| Detention Minutes Incurred | Detention Hours Paid |
|---|---|
| 0-7 minutes | 0 hours |
| 8-22 minutes | ¼ hour the hourly rate |
| 23-37 minutes | ½ hour the hourly rate |
| 38-52 minutes | ¾ hour the hourly rate |
| 53-60 minutes | 1 hour |

Initials: _____    Initials: _____
For:    **J.B. Hunt Transport, Inc.**    For:    **Independent Contractor**

Page **6** of **6**

JBHI000006

*ISSG1*

**\*\*ONLY FOR CONTRACTORS HIRED BEFORE MARCH 2016\*\***



**J.B. HUNT**
**Intermodal**

SSN ▆▆▆▆▆▆

**J.B. Hunt Transport, Inc.**
**Intermodal Independent Contractor Operating Agreement**
**Appendix A: Certificate of Authorized Operation and Customer Specifications**

**Contractor Information**

Name: Girik Issaian

Address: ▆▆▆▆▆▆

**Description of Equipment**

Tractor No. 381720

Make: Freightliner

Year: 2009

Tractor Weight:

VIN: 1FUJGLCK39LAE8674

Wheel Base:

Fifth Wheel Height:

License No. ▆▆▆▆     State: IN

Independent Contractor Operating Agreement Start Date:
Hub Reading at Start Date:

**Carrier's Customers' Specifications:**

Contractor agrees to perform services in accordance with customer specifications, identified in this Appendix A, that may be safely complied with without violation applicable law or Carrier's Policies or Procedures, and without endangering the public, Contractor's workers, and the property being transported.

I. Service Standards

1.    Contractor shall transport such shipments, that Contractor accepts, as Carrier's customer may require by motor vehicle from and to such points between which service may be required, without delay, subject to the availability of suitable equipment for the traffic offered and the specific shipment instructions.

2.    Contractor agrees to perform loading and unloading services as required by Carrier's customer. Each shipment shall be evidenced by a bill of lading or other receipt. Such bill of lading or receipt is to be signed by Contractor, or Contractor's driver or worker, and will

Page 1 of 6

JBHI000007

show the kind, condition and quantity of commodities received and delivered by Contractor at the loading and unloading points.

3.  Contractor understands and agrees in performing services under the Agreement that time is of the essence in the pickup, transportation and delivery of individual shipments and that it agrees to meet all prearranged pickup and delivery times.

**On-Time Service Percentage**

**Contractor agrees Carrier's customer requires, and Contractor will use best efforts to provide 98% on-time performance. Carrier's customer may require that Contractor, or Contractor's driver, is disqualified and removed from its account temporarily after two service failures within a quarter, and permanently in the event of a third service failure during the next six-month period.**

**A Service Failure includes incidents of driver error or mechanical error. A Service Failure does not inlcude shipper or receiver delays, railroad, dispatch error, weather, abnormal traffic flow, and/or other Acts of God.**

II. Provision of Proof of Delivery

Contractor shall provide Carrier with copies of signed bills of lading and signed delivery receipts as evidence of the complete performance of such services.

III. Refused and Rejected Shipments

In the event Contractor attempts to deliver a shipment at the customer's designated delivery location and such shipment is refused or rejected by the consignee, or Contractor is unable to deliver it for any reason, Contractor shall notify Carrier in order to receive disposition instructions from Carrier or Carrier's customer. Contractor shall provide constant and sufficient security and safety for the shipment until such disposition instructions are received.

IV.  Confidentiality

Contractor hereby agrees to the following terms of confidentiality related to the performance of services for Carrier's customer. They are:

Without the express written consent of the other party, no party shall disclose the terms of Carrier's customer's service specifications and/or shipment information to any third party, except (a) as required by law or regulation, (b) to an authorized audit agency designated by a party for audit purposes or (c) to an affiliate or potential affiliate of a party.

V.  *The following are additional factors related to service performed for Carrier's customer:*

*Primary Traffic Lanes or areas of Service: Within a 125-mile radius of South Gate CA.*
This Appendix A is agreed to by the undersigned parties on the latest date set forth below.

Carrier: **J.B. Hunt Transport, Inc.**                    Contractor:  Girile Isseulen

By: _____                    By: _____
      Signature                                                        Signature

Page 2 of 6



SSN ▇▇▇▇▇▇▇▇

## Intermodal

### J.B. Hunt Transport, Inc.
#### Intermodal Independent Contractor Operating Agreement

#### Appendix B: Compensation and Fees

This Appendix B to the Intermodal Independent Contractor Operating Agreement applies to services rendered at the Intermodal location of **South Gate, CA** and shall be effective __July  15__, 20 _18_.

| (a)  IC Compensation | Intermodal |
|---|---|
| Linehaul-Loaded (Per Mile) | $0.90 |
| Linehaul-Empty (Per Mile) | $0.90 |
| Pick-up / Delivery (Drop/Hook) | $50 |
| Pick-up / Delivery (Live) | $75 |
| Otay Mesa, CA Border Repowering of Load | $45 |
| Empty Trailer Reposition | $30 |
| Hazmat Load | $20 |
| Customer Refused Load | $70 |
| Truck Ordered Not Used (TONU) | $30 |
| Safety Training | $30/Hour |
| Driver Orientation (Per Truck) (After 4 day's holdover rate is $50/day) | $75/Day |
| Fuel Surcharge (Revised 3-29-17) | Surcharge Schedule |
| Tolls | Carrier Paid |
| Base Plates | Carrier Paid |
| Permits | Carrier Paid |
| Scales | Reimbursed |

Initials: _____        Initials: _____
For:  **J.B. Hunt Transport, Inc.**        For:  **Independent Contractor**

Page 3 of 6



SSN: ▓▓▓▓▓▓▓▓

**Intermodal**

**J.B. Hunt Transport, Inc.**
Intermodal Independent Contractor Operating Agreement

**Appendix B: Compensation and Fees**

Fees, Charges, Balances and Other Amounts

Pursuant to the applicable provisions of the Independent Contractor Agreement, Independent Contractor shall be liable for the fees, charges, balances and other amounts as set forth in the table below, including, but not limited to the following:

| Nature of Fee/Amount | Fee/Amount |
|---|---|
| Truck Lease/Purchase Payment | NA |
| Independent Contractor-Initiated Re-Power: Minimum Charge | $50 |
| Non-trucking Liability Insurance (Single Limit) | $1,000,000 |
| Preventable Loss: Personal Injury/Property Damage | $1,500 |
| Preventable Loss: Cargo Shortage/Damage | $500 |
| Escrow Funds: Required Balance | $1,500 |
| Escrow Funds: Minimum Weekly Set-Off for Required Balance | $50 |
| Annual Administrative Fee | No Charge |
| Fuel Use/Tax Reserve (per Carrier Directed Mile) | $0.01 |
| Miscellaneous Equipment Issued to Independent Contractor | Equipment Value |
| OBC Monthly Usage Charge | $25 |
| OBC Replacement Value | $2,000 |
| OBC Daily Liquidated Damages (Improper Turn-In) | $50 |
| OBC Maximum Liquidated Damages (Improper Turn-In) | $2,000 |
| Failure to Return Decals/Permits/Plates: Daily Liquidated Damages | $50 |
| Road Service Fee (Tractor Maintenance) | $20/Event |
| Annual Motor Carrier Property Tax (AR, KS, KY, TN) | $55/Year |

Initials: _____   Initials: _____
For:   J.B. Hunt Transport, Inc.   For:   Independent Contractor

Page 4 of 6

JBHI000010



SSN: ███████

## J.B. Hunt Transport, Inc.
### Intermodal Independent Contractor Operating Agreement

#### Appendix B: Compensation and Fees

**Miscellaneous**

A. <u>Carrier's Right to Modify or Terminate</u>

Independent Contractor specifically understands and agrees that Carrier, in its sole discretion, shall have the right to modify or terminate from time to time the compensation rates as set forth in Part I of this Schedule and the fees and related amounts set forth in Part II of this Schedule. Carrier shall give Independent Contractor not less than thirty (30) days written notice prior to the effective date of any such change with the exception of the fuel surcharge payment which will vary at the discretion of the Carrier. The terms of this document supersede any previously executed agreement.

Initials: _____   Initials: _____
For:   **J.B. Hunt Transport, Inc.**   For:   **Independent Contractor**

Page 5 of 6

JBHI000011



SSN: ███████

## Intermodal

**J.B. Hunt Transport, Inc.**
**Intermodal Independent Contractor Operating Agreement**

**Appendix B: Compensation and Fees**

### Detention Schedule

Contractor will be eligible for compensation (detention) in the event that he/she is detained longer than 1.5 hours at a customer. Contractor will be paid following his arrival or customer appointment time, whichever comes last. Contractor becomes ineligible if JBHT is unable to charge the customer detention *due to a driver related service failure*. After 1.5 hours of detention, pay is $30.00 per hour excluding any time the driver is legally required to be off duty or taking a 10-hour break. All detention pay will be paid in 15 minute increments and administered as follows:

| Detention Minutes Incurred | Detention Hours Paid |
|---|---|
| 0-7 minutes | 0 hours |
| 8-22 minutes | ¼ hour the hourly rate |
| 23-37 minutes | ½ hour the hourly rate |
| 38-52 minutes | ¾ hour the hourly rate |
| 53-60 minutes | 1 hour |

Initials: _S. P._    Initials: _____
For:    **J.B. Hunt Transport, Inc.**    For:    **Independent Contractor**

Page 6 of 6